**CHICAGO & N. W. R. CO. v. GRAUEL.**

No. 13414.

Circuit Court of Appeals, Eighth Circuit.

March 24, 1947.

Rehearing Denied April 15, 1947.

Alfred E. Rietz, of St. Paul, Minn. (Nye F. Morehouse, of Chicago, Ill., on the brief), for appellant.

William A. Tautges, of Minneapolis, Minn. (Eugene A. Rerat, of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

Richard Alexander Grauel was caught and crushed between two railroad cars during switching operations of one of appellant's trains on which he was employed as rear brakeman. This action was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., by the special administratrix of Grauel's estate to recover damages sustained by the widow and minor daughter because of his death. From a judgment entered upon a jury verdict in favor of appellee the railway company appeals.

On the day of the accident appellant's eastbound freight train No. 40, 54 cars and an engine, in charge of a conductor, rear brakeman, head brakeman, engineer, and fireman, reached West Point, Nebraska, at about 7:30 p.m., with orders to take a passing track to permit the passage of appellant's westbound freight train No. 117. The railway yards at West Point were some distance east of the depot. When the train reached West Point, Grauel and the head brakeman were in the engine cab. There were several cars in the yards at West Point which train No. 40 was to pick up. As the engine passed the depot Grauel received the switch list identifying these cars, and the train, continuing eastward, entered the north or long passing track in the railway yards, a track which paralleled the main line on its north side. The conductor left the train in the vicinity of the depot.

The north passing track was not long enough to hold all of train No. 40. In order to avoid blocking the main line on which train No. 117 was approaching West Point, it was necessary to cut off several cars from train No. 40 and place them upon another passing track paralleling the main line on its south side, known as the south passing track. As train No. 40 proceeded along the north passing track, Grauel left the train in order to cut it at a street crossing and thus prevent the blocking of the street which crossed the tracks at right angles at a point approximately equidistant from the east and west ends of the north passing track. Before leaving the train Grauel ordered the head brakeman to cut off a sufficient number of cars from the head end of the train to prevent the blocking of the main line at the point where the east end of the north passing track connected with the main line. When train No. 40 stopped at the switch leading from the east end of the north passing track to the main line, the head brakeman cut off the three cars next to the engine and supervised their movement to the south passing track. Grauel met the head brakeman at the point on the south passing track where the three cars cut off from the head end of train No. 40 were placed, and set the brakes on one of these cars while the head brakeman disconnected them from the engine. Grauel and the head brakeman then mounted the engine and returned to the depot, where, after consultation with the conductor it was decided that there was ample time before the arrival of train No. 117 for the performance of the switching operations necessary to pick up the cars awaiting transportation at West Point. One of these cars was a tank car situated on a mill track about one-half mile west of the depot. Several other cars to be picked up were placed at intervals along a track referred to in the testimony as the stock or elevator or stockyards track. The stock track parallels the north passing track on its north side. The stock track connects with the north passing track by switches near the east and west ends of the north passing track. The stock track, however, is shorter than the north passing track, so that the cars of train No. 40 left on the north passing track extended along that track beyond the switches leading from the north passing track into the stock track. The switch at each end of the stock track was blocked by the cars of train No. 40 left on the north passing track, by 12 or 13 cars at the east switch of the stock track and by the caboose and two other cars at the west switch.

Following the conference at the depot the engineer, fireman, and Grauel, on the engine, proceeded westward along the main line to the mill track, where they picked up the tank car and returned to the yards, pushing the tank car ahead of the engine. On reaching the yards they entered the west end of the north passing track and

removed from the cars of train No. 40 on that track the caboose and two other cars. The removal of three cars from the rear end of train No. 40 was necessary to clear the switch leading from the north passing track on to the stock track, and to allow the engine pushing four cars ahead of it to enter the stock track at the west end for the purpose of picking up the several cars on that track. No witness was able to state the exact number of cars on the stock track. The switch list which would have given this information was not produced at the trial. Estimates of witnesses placed the number of cars to be picked up at five and one or two others to be left, spaced at intervals along the track.

When the engine pushing four cars ahead of it entered the stock track, it was moving at a speed of approximately two miles an hour. The night was dark. Grauel rode the stirrup of the lead car of the string being pushed by the engine along the stock track. He was on the engineer's or right hand side of the string of cars. The head brakeman did not take part in this movement, having been ordered by Grauel to take his position at the switch leading from the west end of the north passing track to the main line to throw the switch for the passage of train No. 117. It is undisputed that throughout switching operations on the stock track all movement was under the control and direction of Grauel as rear brakeman. It is also undisputed that throughout the movement of the cars on this track the engineer and the fireman kept a careful lookout for Grauel and his signals controlling movement. Since the night was dark, signals were given by lantern. The evidence also shows that throughout the operations on the stock track the cars were never moved at a dangerous or reckless speed and never at a speed greater than two miles per hour. Grauel was an experienced brakeman of 30 years in the railway's service, having served at times as train conductor. He had been employed on the run through West Point for more than one year and was familiar with the yards and tracks there. It is clear that Grauel and every other member of the train crew, with the possible exception of the fireman, must have known that the east switch of the stock track was blocked by the cars of train No. 40 on the north passing track.

When the string of cars approached the first car on the stock track, the engineer received a stop signal from Grauel. The stop was made to allow Grauel to adjust the knuckles on the drawbar of one of the cars in order that the coupling could be made. This was done, and the engineer received a "go ahead" signal from Grauel, and continued along the stock track toward the east at a speed of two miles an hour. The engineer never received another stop signal from Grauel, and the cars moving along the stock track were never stopped until the moment of the impact with the last car on that track.

When the lead car of the string being pushed along the stock track had reached a point near a derail on the north rail of the stock track, Grauel's lantern momentarily disappeared from the view of the engineer. The rules of the railway company require that an engineer stop his train instantly when a switchman controlling its movement disappears from his sight. On this occasion the engineer did not stop. He estimated that the length of time Grauel's lantern was out of his sight was somewhere between one and five seconds. The interval of Grauel's disappearance was long enough to permit the engineer to inquire of the fireman if Grauel had appeared on the fireman's side of the train and to receive the fireman's answer in the negative. The engineer testified that on the reappearance of Grauel's light he received a "go ahead" signal from Grauel, and that he continued to move the cars at the rate at which they had been moving along the stock track. After seeing the "go ahead" signal the engineer saw Grauel's light going up the ladder of one of the cars ahead of him. There were 10 or more cars being pushed by the engine, and the engineer was unable to say whether Grauel was mounting the east end of the lead car or some other car in the string. In any event, as Grauel mounted one of the moving cars his light disappeared. The engineer said that there was an immediate impact as if the lead car of the string had coupled into a car with its brakes set, and that immediately with the

disappearance of Grauel's light and the simultaneous impact he closed the throttle, applied his brakes and stopped the train.

The derail on the north rail of the stock track was in open position, that is to say in the position which would permit the passage of cars over it without being derailed, as required by the rules of the company when the stock track was being used. It was located at a point about 165.5 feet from the point of the east end switch leading from the stock track to the north passing track. The fouling point between a box car of average size on the stock track and a like car on the north passing track would occur 50 feet east of the derail.

After the stop following the events just recited, the engineer remained on the engine for approximately five minutes, after which, Grauel failing to reappear, he went forward to investigate. He found Grauel crushed between the southeast corner of the lead car of the string on the stock track and the northwest corner of a car on the north passing track. The lead car in the string being pushed along the stock track was a stock car loaded with hogs. Its head or east end was equipped with a brake, the brake platform being about midway between the top and bottom of the car, somewhat nearer the top. Grauel's lighted lantern was on this platform. His head and shoulders extended above the top of the car, his body facing the engine. There was some evidence to show that one of his feet rested on the brake platform and the other on the third rail of the ladder on the east end of the car, and other evidence that his arms and legs were hanging loosely. Grauel was dead.

Investigation revealed that the lead car of the string moving along the stock track had struck the running board of an oil tank car in the cars on the north passing track at about six feet from its east end and, breaking this board, had "cornered" with the next car on the north passing track, which was a box car. The damage to the two box cars was negligible. The only damage to the lead car of the string on the stock track was a bent grabiron at the bottom of the ladder on that car and a bent brake rod. In order to remove Grauel's body, it was necessary to back the string

of cars westward along the stock track. When this movement was made all of the cars on the stock track were already coupled. All of the cars to be picked up were placed in train No. 40 and continued to destination in that train.

There was some evidence, which the jury might conceivably have believed, that at the spot at which the string of cars was being moved along the stock track a stop could have been made within two to four feet. Witnesses for the railway company testified that on the sudden stop of an engine pushing a string of cars the slack in the cars would run out. Slack in railroad parlance is the play in the coupling apparatus between cars, permitting a car being pushed by an engine to move forward about nine inches after the engine is stopped. In a string of cars each car moves forward the nine inches as the one following it stops. In a string of 10 cars being pushed by an engine the lead car on the stop of the engine would continue forward movement for six or seven feet. There was a very slight upgrade in the stock track near the point of the collision. One witness for plaintiff testified that because of this grade the slack would not run out of the cars.

Appellant's main reliance for reversal of the judgment against it is its contention that there was no substantial evidence on which to submit to the jury the issue of negligence on the part of the railway company. On the contrary, appellant contends that the facts as stated establish the negligence of Grauel as the sole cause of his injury. Appellant also challenges the court's charge to the jury.

■ Appellant contends that the court submitted two issues to the jury: (1) whether appellant was negligent in blocking the stock track with cars on the passing track; and (2) whether the train crew, other than Grauel, were negligent in the operation of their engine and cars in the switching movements which terminated in the collision between the cars on the stock track and those on the north passing track. In the view of appellant there was no negligence proximately causing Grauel's death in blocking the switch at the east end of the stock track by the cars in train No. 40

left on the north passing track. Since in the view of the appellant it was error to submit to the jury the question of appellant's negligence in blocking the stock track, the argument is that it is impossible to say whether the jury's verdict was based on this issue improperly submitted to the jury or upon the finding by the jury of negligence on the part of the railway company in the operation of its train in the switching movements which took place after the stock track was blocked. Roth v. Swanson, 8 Cir., 145 F.2d 262, 269.

That part of the court's charge which the appellant asserts submitted to the jury the two issues is as follows: "Plaintiff alleges that decedent's injuries and death were caused by the negligence and carelessness of the defendant, its servants and agents, in causing and permitting one of its cars of a string of cars moving on defendant's so-called house or elevator track, to foul the switch point of its parallel track known as the passing track so that a car upon which decedent was riding on the house track sideswiped a car of the train of cars which occupied the passing track and decedent was caused to be crushed against said car and severely injured, from which injuries he died on October 8, 1945."

But this charge does not submit to the jury two separate issues of fact on either of which the jury might base a finding of negligence on the part of the railway company. On the contrary, the issue submitted to the jury was whether on all the evidence the railway company was guilty of negligence in the operation of its cars after the arrival of train No. 40 in the yards at West Point. It does not direct nor permit the jury to find that the mere blocking of the stock track was of itself a negligent act upon the part of the railway company proximately causing Grauel's death. The court, therefore, did not commit error in refusing the railway company's request "to withdraw the question of negligence based on the blocking of the stockyards track" from the consideration of the jury. The question was not submitted. The blocking of the stock track was but one of the factors which the jury might properly consider in connection with all other evidence in arriving at its verdict.

In the complaint appellant's engine crew were charged with negligence in failing to keep a proper watch for signals from Grauel at all times during the movement of the cars on the stock track, and in failing to keep locked the derail on the stock track. On these issues the court instructed the jury as follows:

"You are instructed that there is no evidence in this case which would warrant you in basing a verdict for the plaintiff on the claim that the members of defendant's engine crew negligently failed to keep watch for signals from Mr. Grauel at all times or that defendant negligently failed to keep the derail locked on the stockyard track.

\* \* \* \* \* \*

"You are further instructed that it was the duty of Mr. Grauel to protect the easterly end of the track or drag of cars being pushed along the stockyards track and to signal the engineer to stop the same before it collided with the cars on the long passing track; that it was not the duty of the engineer to see to it that the easterly end of the train did not collide with the cars on the passing track. He fulfilled his duty when he obeyed the signals of Mr. Grauel."

The court then charged the jury in the following language: "It was the duty of the engineer to be watchful at all times for signals from Grauel and to obey the same when given. If you find by a preponderance of the evidence that the defendant, its agents and servants, other than the plaintiff deceased, were negligent in whole or in part in operating its engine and cars or in the manner in which it made its train and switching movements, in causing an impact to occur between the cut of cars on the elevator track and the train on the passing track and that such negligence in whole or in part directly and proximately caused the injury and death of plaintiff, it becomes your duty to find a verdict in favor of plaintiff \* \* \*."

Appellant challenges these instructions on the ground that they are in such direct conflict as to require reversal. The argument is that the court first advised the jury that there was no evidence which would warrant a verdict for the plaintiff on the claim that the engineer negligently failed to watch for signals from Grauel, and thereafter sub-

mitted to the jury the question of whether the engineer was negligent in the respect stated. But the charge is clearly not subject to this criticism. In the view of the trial court the evidence was not such as to permit the jury to find the engineer guilty of negligence in failing to keep a lookout for signals from Grauel. In the first paragraph of the charge, the issue was clearly withdrawn from the jury's consideration. The last part of the charge quoted did not submit the issue. It did recognize the duty of the engineer to keep the proper lookout for signals from Grauel and his additional duty of obeying the signals when he saw them. The charge permitted a recovery by plaintiff if the jury found from the evidence that, although keeping the proper lookout, the engineer was negligent in not responding with proper care to the signals which he received from Grauel. All that can be said of the charge is that it submitted to the jury the latter issue which was under the evidence for the jury's decision.

▮ Appellant also assigns error in the following portion of the court's charge: "In other words, the care in each case must be commensurate with the risks of the situation and the capacity of the participants, and I might tell you that there is a presumption in law in death cases that the deceased exercised due care for his own safety. This presumption may be refuted or rebutted by evidence which destroys the force of the presumption."

Appellant contends that the court attributed to the presumption of due care by a deceased for his own safety "the probative force and weight of affirmative evidence, notwithstanding there was substantial evidence tending to explain the actual occurrence". See Wabash R. Co. v. De Tar, 8 Cir., 141 F. 932, 939, 4 L.R.A.,N.S., 352. One answer to this assignment appears in that part of the challenged instruction which told the jury that the presumption was refuted by evidence which destroyed its force. Another is that there was not, as appellant contends, any evidence, substantial or otherwise, to show with certainty the actual occurrences at the moment of the collision in which Grauel met his death. All that is known is that Grauel was caught and crushed between two

colliding cars while presumably in the exercise of ordinary care for his own safety. What happened at the moment of impact between the cars, what Grauel was doing or attempting to do immediately before or at the instant of the collision can not be definitely known. In these circumstances, the presumption that he was in the exercise of due care for his own safety prevails, and may be properly taken into consideration by the jury in determining the question whether under the evidence the engine crew whose actions were known were guilty of negligence in the handling of the cars on the stock track. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 34, 64 S.Ct. 409, 88 L.Ed. 520.

▮ The difficult question in this case concerns the sufficiency of the evidence to support the verdict of the jury. The only witnesses who testified concerning the train movements in the yards at West Point were the members of the crew of the railway company's train No. 40. The only witnesses who testified concerning the movements of the cars along the stock track were the engineer and fireman. All of these witnesses were called by the plaintiff. Their version of their actions immediately preceding the collision in which Grauel was killed was not, and in the circumstances could not be contradicted by either party. And since their evidence established that every movement of the engine and cars on the stock track was under the supervision and control of Grauel, whose signals the engineer and fireman were required to obey, and in this situation the duty of preventing the collision rested primarily upon Grauel, also under the duty of exercising due care for his own safety, the railway company contends that there is a total absence of evidence to substantiate a finding by the jury of negligence on the part of any member of the train crew contributing wholly or in part to Grauel's death. The issue is close, but recent decisions of the Supreme Court, we believe, require decision in favor of the jury's verdict.

▮▮ That there was no conflict in any of the evidence adduced at the trial is not conclusive. The question before us is not what the jury's verdict should have been on uncontroverted facts, but whether there

was any substantial evidence upon which the verdict of the jury could properly be based. "For the decision of that question, we must assume as established all the facts that the evidence supporting the plaintiffs' claims reasonably tends to prove and that there should be drawn in the plaintiffs' favor all the inferences fairly deducible from such facts." Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 439. "Evidence which is uncontradicted is not necessarily to be accepted as true. Its weight and the credibility of the witnesses who gave it are usually for the jury to determine." Elzig v. Gudwangen, supra, page 440; Doering v. Buechler, 8 Cir., 146 F.2d 784, 787; Railway Mail Ass'n. v. Chamberlin, 8 Cir., 148 F.2d 206, 207. In the last case arising under the Federal Employers' Liability Act, decided by the Supreme Court, Ellis v. Union Pacific R. Co., 1947, 67 S.Ct. 598, 600, the Court speaking on the point now under discussion said:

"The Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' the cause of the injury. 45 U.S.C., § 51, 45 U.S.C.A. § 51. Brady v. Southern R. Co., 320 U.S. 476, 484, 64 S.Ct. 232, 236, 88 L.Ed. 239. Whether those standards are satisfied is a federal question, the rights created being federal rights. Brady v. Southern R. Co., supra; Bailey v. Central Vermont Ry. Co., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444.

"The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Lavender v. Kurn, supra [327 U.S. 645, 66 S.Ct. 740]. * * *"

In a case in which the jury has drawn an inference of negligence from uncontroverted facts, the language in Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 744, must be accepted as significant on the issue under discussion: "It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." And see Griswold v. Gardner, 7 Cir., 155 F.2d 333; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967, 323 U.S. 574, 65 S.Ct. 421, 89 L.Ed. 465; Bailey v. Central Vermont Ry. Co., 319 U.S. 350, 353, 354, 63 S.Ct. 1062, 87 L.Ed. 1444; Tennant v. Peoria & P. U. Ry. Co., supra, 321 U.S. p. 35, 64 S.Ct. 412, 88 L.Ed. 520; Jesionowski v. Boston & Maine R. Co., 1947, 67 S. Ct. 401.

Guided by our interpretation of the cases lately decided by the Supreme Court, we cannot say that the verdict of the jury in this case is without substantial basis in the evidence. It is true that if the jury was required to accept the testimony of the engineer concerning what occurred on the stock track, a finding of negligence on his part contributing to the cause of Grauel's injury and death could not be sustained. But the mere fact that the engineer, as well as the other witnesses, was called by the plaintiff, did not bind the jury to accept the evidence given by them. The jury was still judge of the credibility of these witnesses and of the weight to be given their testimony. The jury could take into consideration in appraising this testimony the fact that they were employees of the appellant railway company and, as such, interested in avoiding the imputation that their negligence caused the death of a fellow employee. And the testimony of the engineer was not above question by reasonable minds. From his admission that he did not stop on the occasion of Grauel's first disappearance from his sight although his duty to stop promptly was imperative, the jury may have concluded that he did not stop as promptly as reasonable care in the circumstances required on Grauel's second disappearance. If the jury accepted as true the testimony of the witnesses who said that the stop on Grauel's disappearance might have been made within two to four feet, there was at least some evidence to justify rejecting the engineer's testimony that he stopped immedi-

ately on the second disappearance. For there was evidence for the plaintiff that, because of the slight upgrade in the stock track near the point of collision, the slack would not run out of the cars, and it was undisputed in the evidence that the car on which Grauel was riding moved seven or eight feet against the resistence of the running board on the tank car which it struck before crushing Grauel against the corner of the box car next to the tank car. The duty of the engineer to stop as promptly as possible on signal from Grauel must be measured by the fact that he knew at the moment of Grauel's second disappearance that the lead car on the stock track was very near the cars on the passing track blocking the stock track switch, and that his failure to stop the cars ahead of his engine promptly or the failure to make the coupling with the last car ahead of his engine might result in a collision. He had some warning of Grauel's danger from this knowledge and from his knowledge that Grauel was mounting one of the cars ahead of him and in a position of peril if a collision occurred. The engineer's testimony that after his first disappearance from the side of the car Grauel gave the engineer a "go ahead" signal is not wholly consistent with the fact that at the time of Grauel's disappearance the cars were moving steadily at about two miles an hour, and that no stop was made when Grauel disappeared. The necessity of the "go ahead" signal from Grauel in the circumstances is not readily apparent.

Judgment affirmed.