Teresa E. EASTMAN, Administratrix of the Estate of Eric Gunner Eastman, deceased, or individually as his surviving widow, Appellant,

v.

SOUTHERN PACIFIC COMPANY, Appellee.

No. 14722.

United States Court of Appeals Ninth Circuit.

May 16, 1956.

Thompson & Sahlstrom, E. B. Sahlstrom, Eugene, Or., Peterson & Pozzi, Nels Peterson, Portland, Or., for appellant.

Koerner, Young, McColloch & Dezendorf, John Gordon Gearin, Portland, Or., for appellee.

Before McALLISTER, Circuit Judge, and GOODMAN and MATHES, District Judges.

McALLISTER, Circuit Judge.

This is an action brought by appellant under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for the recovery of damages for personal injuries resulting in the death of her decedent. Appellee moved for a directed verdict of no cause of action at the conclusion of the proofs, but the trial court allowed the case to go to the jury which returned a verdict in favor of the appellant in the amount of $10,000. Upon motion of the appellee, the trial court entered judgment notwithstanding verdict in its favor, of no cause of action; and from such order, appellant seeks review.

Appellant's decedent, Eric Gunner Eastman, was employed in the Eugene, Oregon, yards of the Southern Pacific Company as a millman. His regular duties were to work in the mill room of the railroad company's repair shop as a carpenter and do the carpentry work in railway cars on the repair track.

On October 16, 1952, Eastman was working on a "flanger" car on repair track No. 15. No particular time was specified for doing this work and Eastman had a good deal of discretion as to when and how the work would be performed. Immediately adjacent to the flanger car, on the same repair track, was a Clark type dump car. This type of dump car was of an intricate design and complicated mechanism. It had been placed upon the repair track because the dumping mechanism was defective; and car-men MacGregor and Barker had been assigned to repair it. After they had been working about twenty minutes on the car, Lambert, the lead man, arrived on the scene and saw that they were having difficulty with the dumping arm of the car. MacGregor and Barker had been trying to operate the mechanism by the application of air. The real trouble was that one of the dumping arms of the car had buckled.

When Lambert arrived at the dump car, Eastman, who had been working on the flanger car a few feet west on the same track, came over and engaged in some discussion, pointing out certain things about the dump car. Lambert had procured a pick handle and then went under the car from the south side. Eastman and Barker and MacGregor were in close proximity to Lambert during his work with the dumping mechanism. While under the car, Lambert had his back to the other workmen and, finally,

when he used the pick handle to pry or force the dumping arm into position, the door or side of the car dropped suddenly and struck Eastman on the head, causing severe injuries from which he died.

 Was there evidence of negligence on the part of the railroad company or its employees that caused or contributed to decedent's injury and death? Appellee claims that there was no evidence of such negligence; that Eastman had been warned to stay away from the car; and that it was his failure to pay any attention to the warning that made him remain in such close proximity that he was struck by the falling dump door.

The testimony is somewhat in conflict as to what was said and done by appellant's decedent and the other employees at the time of the accident, but we need not consider any questions arising out of such conflict. MacGregor testified that as Lambert went under the car, Eastman "took about two steps with him, and he had his finger on him * * he pushed under after him, he pushed toward him after him, had his finger out pointing to something where he went." This could be taken to mean that Lambert knew Eastman was right next to him as he went under the car. MacGregor further testified that Lambert "had the pick handle in there * * * working, had it on his shoulder * * * and when he freed that down come the side, * * and hit him [Eastman] right on top of the head." MacGregor further stated that before Lambert went under the car, and when they were on the other side of the car, MacGregor told Eastman to "Keep in the clear."

As to the warning claimed to have been given Eastman by Lambert, the latter testified:

"Q. Did you give any warning while you were under the car before you manipulated that dumping arm as to what you were going to do? A. Not while I was under but just before I went under, yes.

"Q. Did you make any statement at all while you were under the car manipulating that dumping arm? A. No, none was required.

"Q. And you knew at that time that Mr. Barker, Mr. Eastman, and Mr. MacGregor were all in close proximity, didn't you? A. Yes."

What kind of warning Lambert gave to Eastman was not disclosed. Barker testified that when he was manipulating the valves for the air mechanism, he told Eastman that he had better get back out of the way or he might get hurt; but that was some time before the accident—how long, we do not know, for when the court asked Barker whether it was less than fifteen minutes before the accident, Barker's vague reply was that he "would say so." It may have been that Eastman did observe Barker's warning and kept away from the car during the application of the air to the dumping mechanism. In any event, the accident did not result from Eastman's failure to exercise due care with regard to Barker's operation of the air mechanism; and Barker testified that he had voiced no warning to Eastman, subsequently, when Lambert went under the car with the pick handle.

The Clark type dump car involved in the accident was, as already stated, a railroad car of intricate design and complicated mechanism. MacGregor testified that it was a very rare car in that vicinity. He had only seen one before, and was not acquainted with its mechanism. Lambert, an experienced railroader, and the lead man, had never worked on such a car before. Taking into consideration these circumstances and in the light of the evidence above set forth, the question whether any warning was given to Eastman or whether a warning, if given, was sufficient to apprise him of the danger of being near the car while Lambert was working on the buckled arm, was for the jury. It is, indeed, doubtful that Lambert, the experienced lead man, knew that by prying the dumping arm with a pick handle, the whole dumping side of the car would suddenly fall; but it did, with fatal results. For Lambert, never before hav-

**618**

ing worked on a car of this type, was manipulating an instrumentality that was highly dangerous and perilous to the lives of any persons who were standing within six feet of the car itself. He may have known at the time he pried the dumping arm that Eastman was in close proximity; and he may not have known that the side of the car would fall when he pried the mechanism loose. Was he manipulating this dangerous dumping arm, without knowing how perilous it was—and doing so at the risk of Eastman's safety and life? These were questions for the fact finder, in this case, the jury. The jury could disbelieve the testimony of any of the witnesses. "The jury was * * * judge of the credibility of these witnesses and of the weight to be given their testimony. The jury could take into consideration in appraising this testimony the fact that they were employees of the appellant railway company and, as such, interested in avoiding the imputation that their negligence caused the death of a fellow employee." Chicago & N. W. R. Co. v. Grauel, 8 Cir., 160 F.2d 820, 826. We find it unnecessary to pass upon the interesting contentions of both parties with regard to the presumption of due care.

We are of the opinion that there was evidence from which the jury could conclude that the railroad company, through its employee, was guilty of negligence in manipulating the defective dumping mechanism and causing the side door of the car to fall at a time when appellant's decedent was in close proximity thereto and in a place of peril, unknown to him; and that, under the Federal Employers' Liability Act, his injuries and death resulted, *in part*, from such negligence in the manipulation of the mechanism. For while other inferences might have been drawn, the essence of the jury's function is to select from among conflicting inferences, that which it considers most reasonable. Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520.

The case was close and well tried throughout by Judge Solomon and submitted to the jury under clear and succinct instructions. Our view of the evidence, however, brings us to the conclusion that judgment should have been entered upon the verdict.

In accordance with the foregoing, the judgment rendered in favor of the appellee on motion for judgment notwithstanding verdict is set aside and the case remanded with instructions to the district court to enter judgment upon the verdict of the jury.