**COMMERCIAL UNION ASSURANCE COMPANY, Ltd., Appellant,**

v.

**Frances L. BERRY, Appellee.**

**No. 18164.**

United States Court of Appeals Eighth Circuit.

April 28, 1966.

---

Reed O. Gentry, of Rogers, Field & Gentry, Kansas City, Mo., for appellant.

John J. Alder, Kansas City, Mo., Herman M. Swafford, and R. I. Kidd, Kansas City, Mo., for appellee.

Before VOGEL, Chief Judge, BLACK-MUN, Circuit Judge, and STEPHEN-SON, District Judge.

VOGEL, Chief Judge.

Defendant-appellant, Commercial Union Assurance Company, Ltd., a corporation, issued a group accident policy for the benefit of subscribing employees of Consolidated Underwriters of Kansas City, Missouri. Charles M. Berry became an assured under such policy. Frances L. Berry, Mr. Berry's wife and plaintiff-appellee herein, was named as the beneficiary. The policy provided for $30,000 in accidental death benefits. On February 25, 1962, in Clay County, Missouri, Mr. Berry died under circumstances which allegedly justified a claim for accidental death under the policy. This case was originally commenced in the Circuit Court of Jackson County, Missouri, but because of diversity of citizenship and the $30,000 amount involved, it was removed to the United States District Court for the Western District of Missouri. The case was tried to a jury, which returned a verdict in favor of the appellee for the face amount of the policy. In this appeal from the final judgment, it is claimed that the trial court erred in failing to sustain appellant's motion for a directed verdict and its motion for judgment n.o.v. Appellant alleges that appellee failed to

make a submissible issue for the jury on her claim that Mr. Berry's death resulted from an accident within the terms of the policy. In other words, appellant challenges the sufficiency of the evidence to justify the jury's verdict. We affirm.

The evidence established that Mr. Berry, a fire insurance underwriter, was slight in build and weight, being five feet three and three-quarters inches in height and weighing 132 pounds. He was 52 years of age at the time of his death. So far as his wife and friends knew, he had had no previous difficulty with his heart and had not been under the care of a doctor for the ten years preceding his death. He worked regularly from 8:15 a. m. to 5:00 p. m. five days a week. On week-ends he operated a "ham" radio at home. He used to play baseball until the baseball field was moved. He took up bowling in the 1960–61 season and thereafter bowled once a week with his wife on Sunday nights.

On Sunday, February 25, 1962, Mr. Berry spent a normal day. He worked with his "ham" radio, took a nap, ate a light dinner at home and had dessert at a friend's house. Appellee and her husband arrived at the bowling center, the North Kansas City Bowl, about 7:00 p.m. that night. A freezing rain was falling. They walked about 100 feet from their parking space in the bowling center parking lot to the bowling establishment. Mr. Berry bowled three games in the heated building.

When the bowling was over at 10:15 p.m., the Berrys returned to their car. The parking lot surface was very slick from the freezing conditions. Mr. Berry went around to the driver's side of the car and appellee went to the passenger's side. He got into the car and started the motor. When appellee tried to open the door on her side, her hand slipped off the door handle, which was covered with ice.[1] She then put on a glove and was

able to get the door open. By this time Mr. Berry had gotten out of the car and was scraping ice from the windshield with a red plastic scraper. Simultaneously he was talking to appellee about her bowling. At the time appellee entered the car, the driver's door on the left side of the car was closed but the appellee could see her husband's left hand as he scraped the windshield.

When Mr. Berry grabbed the door handle, apparently with his right hand, to re-enter the car, appellee heard a click which indicated that the door was about to open. Appellee testified that ordinarily a second click would follow the first and then the door would open. On this occasion, however, appellee heard only the single click. Her husband then seemed to disappear. She heard no moan or sound of any kind. After waiting for awhile, she called to her husband, thinking that he had dropped his glove. She then emerged from the car and found her husband lying on his back with his arms spread out. His feet, that portion of his anatomy lying nearest the car, were about ten feet away. His hat was two or three feet further behind him. Appellee thought her husband had hurt his back. His face was drawn in pain. She started to lift him, at which point she felt a ridge of ice under his neck. He turned away from her and said, "Oh." She put his hat under his head and kept talking to him.

Appellee stated to an officer, who arrived on the scene, that, "My husband fell." The officer called for a rescue squad. Mr. Berry was still breathing at the time he was placed in an ambulance but he was pronounced dead at the North Kansas City Hospital.

Dr. O. S. Pate, physician and coroner of Clay County, Missouri, testified that he examined Mr. Berry externally at the hospital and found a small recent bruise of about one and one-half inches in di-

1. The bar-type outside door handles on the Berry car had to be pulled straight out at one end to make the car doors open. The handles did not go up and down nor was a button pushed to release the door catch. Appellee testified that these car handles caused trouble in that the car doors were often hard to open, especially in damp weather when the door handles would stick.

ameter on Mr. Berry's back between the shoulder blades. This was "a result of trauma". It was "the kind of bruise that could come from a fall * * *". He found no other marks excepting in a small area around the nose, which could have come from a resuscitator. He directed Dr. William McPhee to perform an autopsy. So far as he knew, the general condition of Mr. Berry's health was good.

Dr. McPhee testified as follows as to his findings:

"The heart was significantly diseased and showed a marked degree of hardening of the arteries of the heart, with one of the arteries blocked or occluded at sometime in the past. This was a relatively old process and new blood vessels had been formed in the occluded area. The process which I observed had been present for several months or perhaps several years. I found a scar in the musculature of the heart near its apex. This was a healed myocardial infarction. This was also an old condition which goes hand in hand with the occluded artery. The lower lobes of the lungs contained a considerable amount of fluid and blood which I interpret to be due to circulatory failure. I found edema in the brain. I found no fresh injury to the heart. I found no tissue evidence to indicate a recent heart attack. I did not find a massive infarct.

"I found a large amount of mucus in the air passages especially in the trachea and in the air passages leading to the left lung. This was an abnormal and unusual finding which would impede the passage of air into the lungs and would be a serious thing in someone with a heart as compromised as this one. There are many factors which might play a part in causing this condition to exist."

A long, detailed hypothetical question, encompassing appellee's testimony as to the events leading to the death of her husband and Dr. McPhee's findings from the autopsy, was propounded, in answer to which Dr. McPhee testified that he could say with reasonable medical certainty that Mr. Berry's death had a direct relationship to the hypothetical facts as given. The questioning of Dr. McPhee proceeded as follows:

"Q. (Mr. Alder [counsel for appellee] continuing): So that we'll get it clearly before the jury, Doctor, let me ask you again.

"Assuming the facts I have given you in the hypothetical, can you state with reasonable medical certainty whether or not the end result of the death had a direct relationship to the facts I have given to you?

"A. Yes, I think they did.

"Q. All right, sir. In order to explain that point, would you state a little more definitely, Doctor, the nature of what causes aspiration in connection—the type of aspiration that you found, in connection with the findings you made in your autopsy, in your pathology reports?

"A. Ordinarily some sudden event, a fall, a blow on the back, a blow on the head, a sudden loss of consciousness for one reason or another. Many different things will cause people to aspirate various objects. Food that may happen to be in their mouth. They may vomit and aspirate material from their gastrointestinal tract, particularly the stomach. There are many reasons for this.

"Q. May I state to you hypothetically, additionally, it appears that this hypothetical man was not conscious during the time that he was seen by his wife and the others at the scene.

"A. Yes.

"Q. Would that be of any importance to you, sir?

"A. It would, because when a person is unconscious they (he?) frequently have lost their cough reflex and they are unable to clear their passages.

"Q. Doctor, you said something about a fall or an injury to a back. The fact that the initial doctor found

a bruise in the back, would that be of significance to you in this case?

"A. It would depend on whether this was a—described as a fresh bruise.

"Q. It was.

"A. Seemed to be fresh. If so, a blow of that type could and probably did cause the man to suddenly inhale as he fell, probably was caused by the fall——"

After stating that the mucus in the low bronchus comes from some unusual outside force, Dr. McPhee testified further:

"Q. This mucus you found in the low portion of the bronchus, if I understood you earlier, that comes from some unusual outside force, didn't it?

"A. That's correct.

"Q. Doctor, in your examination you found no massive clots, did you?

"A. I did not.

"Q. Showing any that disrupted the heart recently?

"A. I did not."

On cross-examination, Dr. McPhee was asked:

"Q. And you also could postulate or speculate that breathing in that cold air with that mucus that was formed, could have caused him to breathe mucus itself and clog up his breathing apparatus?

"A. No, I don't think that could happen naturally.

"Q. Wouldn't you say that he might have aspirated mucus because of breathing cold air?

"A. I think the mucus collected in his upper air passages without some unusual stimulus to do so.

"Q. Yes, I understand. And if he had a heart attack while standing, if he actually had a heart attack under those conditions that I have related, that you would have anticipated the exercise, the breathing the cold air, this kind of heart, and thus have had a heart attack while standing and collapsed, you would have expected that unusual incident, and as you mention-

ed, a period of unconsciousness, to aspirate that mucus?

"A. It could have happened.

"Q. And that is exactly the condition you found here, is it not?

"A. It's certainly similar, yes.

"Q. Yes, sir. And the fact is that you were unable to say, with reasonable medical certainty that that did not happen, isn't that correct?

"A. That's correct.

"I think something unusual happened to cause Mr. Berry to aspirate mucus into his lower respiratory tract. Mr. Berry could have lived normally without feeling pain if he had sufficient collateral circulation. The circulation of Mr. Berry's heart was compromised and this would be a hazard to unusual forms of activity or an unusual event whereby the heart when called upon for unusual action or exertion of effort might not be able to comply and would fail."

Dr. C. G. Leitch, a physician and surgeon who had had considerable experience in pathology, stated, in answer to a hypothetical question similar to that propounded to Dr. McPhee, that he could tell with reasonable medical certainty the cause of Mr. Berry's death. He was asked:

"Q. (Mr. Alder continuing): Now, Doctor, then my question is: Do you have an opinion based on a reasonable medical certainty as to the cause of death?

"A. I do.

"Q. Will you state that opinion, sir?

"A. My opinion is that this man died as a result of an aspiration, bronchial obstruction, and factors that were set up as a result of that bronchial obstruction."

He stated further:

"My opinion is that the mucus got into the trachea under 'some acute spasmodic aspiration reflexion.' I can't tell from the post-mortem examination per se what it might've been,

but it was a sudden spasmodic reflexion by which he aspirated this material. This collection of mucus is the result of some circumstance which reflexly and acutely results in the aspiration or sucking in of a glob of material. This aspiration can come about from any force to the outside of the abdomen or for instance when a dentist is pulling a tooth, the mere stimulation of the back of the throat will result in sudden aspiration of the tooth. This man's death resulted from the impairment of his ability to oxygenate because of the existing bronchial obstruction, requiring his heart to increase its output and the heart being unable to respond and, therefore, resulting in cardiac arrest."

He testified that an acute circulatory failure with an acute congestion is contrary to the picture seen in a man who gets a sudden episodic change with a cardiac arrest. Such a man's heart would stop and none of the phenomena present in Mr. Berry would be evident in the tissues examined in a post mortem. He testified, "I found that this man had degenerative heart disease that did not result in his death."

Dr. Harvey Jennett, the sole medical witness called by the appellant, testified, in answer to a hypothetical question encompassing all the known facts, that he also had an opinion based on reasonable medical certainty as to the cause of Mr. Berry's death. Dr. Jennett stated:

"It sounds to me like he died of natural causes of a diseased heart."
He also said:

"In my opinion it cannot be said positively that there is any relationship of the mucus to the heart failure. With a heart attack of this nature one of the common side effects is a mucus formation. In my opinion, mucus came from the congestion and irritation in the left lung which was the result of a heart attack. In my opinion, mucus in the left bronchus and occluding the left bronchus could not produce a heart attack with a heart in the condition of Mr. Berry's. In my opinion the heart like this together with exercise and cold air would result in a heart failure. A large per cent of the people get atherosclerosis as they get older. In my opinion, Mr. Berry died before he aspirated mucus into his bronchus. If only one bronchus was occluded he has three other lobes to get air from. I think Mr. Berry died a sudden death and didn't live long enough to develop signs to prove he had swelling and congestion and other pathological signs. The presence of mucus was not sufficient to stop Mr. Berry's breathing and in turn stop his heart. It is a natural and to be expected sequel of a coronary heart attack to find bloody mucus in the lungs following the heart attack."

It thus appears that we have direct conflict in the testimony of the medical experts as to the cause of death. Dr. McPhee and Dr. Leitch each expressed the opinion, based upon reasonable medical certainty, that the cause of death was an accident. Dr. Jennett expressed a contrary opinion to the effect that Mr. Berry died of "natural causes of a diseased heart".

In denying appellant's motion for a new trial or, in the alternative, for judgment in accordance with its motion for directed verdict, Judge Hanson, in a Memorandum Opinion, summarized the evidence and concluded the jury could properly find that Mr. Berry died as a result of a fall. In regard to the medical evidence, he stated further that:

"There was testimony from which the jury could and did find that the aspiration which resulted in the death was caused by a fall. Dr. McPhee stated this probably was caused by a fall. R. 127. This was substantiated by Dr. Leitch. R. 193, 180, 182."

The appellant argues that:

"Because of the absence of any substantial or inferential testimony that the decedent fell because he accidentally slipped on the ice and because the medical evidence was not adequate to establish that decedent's death was the

result of accidental slipping, the plaintiff has failed to make an issue for the jury on the basic question of accident."

Appellant's attack is two-pronged. First, appellant argues that there was no evidence to show that Mr. Berry had suffered an accidental fall. Assuming arguendo that appellant is correct in this contention, it further argues that appellee's medical evidence did not and could not by itself bulwark the proof of an accident so as to make a submissible case for the jury. Apparently appellant concedes that if there is evidence establishing that Mr. Berry accidentally fell, then there is medical evidence sufficient to show that the fall resulted in death through an acute spasmodic aspiration reflexion. We conclude that there was evidence to show an accidental fall and, in any event, that the medical testimony adds to and supports the determination of an accidental fall.

▮▮▮ In considering the sufficiency of the evidence, we must take that view thereof which tends to support the conclusion of the jury and must accept as established all inferences favorable to that result. In denying the appellant's post-judgment motions, we think Judge Hanson followed accurately and well the admonition of the Supreme Court of the United States in Lavender v. Kurn, 1946, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fairminded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And

the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

See, also, Tennant v. Peoria & P. U. Ry., 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520, rehearing denied, 321 U.S. 802, 64 S.Ct. 610, 88 L.Ed. 1089.

In a diversity case wherein we were also applying the law of Missouri, the late Judge John Sanborn said for this court in Anglen v. Braniff Airways, Inc., 8 Cir., 1956, 237 F.2d 736, 740:

"* * * In a jury case, where conflicting inferences reasonably can be drawn from evidence, it is the function of the jury to determine what inference shall be drawn. Compare, Lavender v. Kurn, 327 U.S. 645, 652–653, 66 S.Ct. 740, 90 L.Ed. 916, and Chicago & N. W. R. Co. v. Grauel, 8 Cir., 160 F.2d 820, 825–826. It is only where the evidence is all one way, or so overwhelmingly one way as to leave no doubt what the fact is, that a court is justified in taking a case from a jury. See Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; and compare, Hoyt v. Clancey, 8 Cir., 180 F.2d 152, 154–155."

Here the evidence was not so overwhelmingly in favor of appellant's position as to justify taking the case from the jury. Under the conditions existing on the night of February 25, 1962, as described in the uncontradicted testimony of appellee, it is eminently possible that reasonable men could and did find that such an accident took place. The slick surface of the parking lot, the hard-to-open car door handle (see f. n. 1, supra), the sudden disappearance of Mr. Berry, the bruise on his back, the ridge of ice, the position of his body, etc., are all factors that could support a finding of accidental death. Although this is obviously a close case, there is sufficient circumstantial evidence to support a verdict under both federal and Missouri law where, as here, the complaining party has produced, as described in Cudahy

Packing Co. v. N. L. R. B., 8 Cir., 1940, 116 F.2d 367, 371 (citing a Missouri case), " * * * evidence of facts and circumstances which may be accepted by the trier of the fact as establishing with reasonable certainty the truth of the inference contended for." See, also, Wray M. Scott Co., Inc. v. Daigle, 8 Cir., 1962, 309 F.2d 105, 109; Ford Motor Co. v. Mondragon, 8 Cir., 1959, 271 F.2d 342, 345; Anderson v. St. Louis-S. F. Ry., 1963, 367 S.W.2d 657, 659–660 (Mo. App.).

■ The jury here could well infer from the testimony and evidence that, although Mr. Berry had had heart attacks or heart disease in the past, he had not had any such attack for some time and he did not have a heart attack on the night of his death; that in attempting to open the left-hand door he slipped and fell; that in the fall he struck a ridge of ice, causing the bruise on his back between the shoulder blades; that this resulted in sudden spasmodic reflexion by which he aspirated material into his lower respiratory tract; and that his death " * * * resulted from the impairment of his ability to oxygenate because of the existing bronchial obstruction, requiring his heart to increase its output and the heart being unable to respond and, therefore, resulting in cardiac arrest." This is true even though there also may have been sufficient contrary evidence to justify a different conclusion. The mere possibility that the jury could have found otherwise than they did is not enough to upset its findings where such are based on substantial testimony and are not entirely unreasonable. Circumstantial evidence may point to different and opposite results. It is for the jury to say which is the correct one. The jury's only criterion is that it must arrive at its conclusion by the "fair preponderance of the evidence" rule. Cf., Holland v. United States, 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137–138, 99 L.Ed. 150, 166–167, rehearing denied, 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731, a criminal case, which involved circumstantial evidence and the more stringent "beyond a reasonable doubt" test necessary for the jury verdict therein.

The appellant cites to us as supporting authority what it refers to as the "Kimmie Rule" taken from Kimmie v. Terminal R. R. Ass'n, 1933, 334 Mo. 596, 66 S.W.2d 561. There the plaintiff was suffering from a malignant tumor. The dispute was whether he suffered it as the result of a fall. The medical testimony was inconclusive. The Missouri Supreme Court stated, at page 564 of 66 S.W.2d:

" * * * It [the tumor] was certainly an unusual and not an ordinary or natural result of such a fall. No layman could know or have any reasonable basis for an inference that it [the tumor] did result from it [the fall]. *The opinion of the doctors that it* [the tumor] *might, could, or would result from the fall is no more than an assurance that such a result was scientifically possible.* Edmondson v. Hotel Statler Co., 306 Mo. 216, 267 S.W. 612; Meyers v. Wells (Mo.Sup.) 273 S.W. 110; Mueller v. St. Louis Pub. Service Co., (Mo.App.) 44 S.W.(2d) 875, and cases cited. It was not substantial evidence that it did result from it and *there was not here other ample evidence, 'tending to exclude all other causes save the fall and to prove that the fall was the cause,' as in those cases.* No other evidence of the doctors went further than to show possibility." (Emphasis supplied.)

Accepting for the moment the assumptions of the parties herein that Missouri law governs, the situation in *Kimmie* is not the same as that herein. First, there is "other ample evidence", discussed supra, besides the testimony of Dr. McPhee and Dr. Leitch, to support a finding of accidental death. Second, the two doctors called by appellee testified with reasonable medical certainty that Mr. Berry's death was brought about by the fall and blow on the back, which event caused an unexpected, spontaneous, uncontrollable aspiration in his trachea which resulted in accidental death. This testimony amounts to more than an "assurance" of "possibility".

Other cases which appellant has cited to us which follow the "Kimmie Rule" are equally distinguishable and unpersuasive. It cannot be successfully maintained here by appellant that circumstantial evidence may not be employed to establish the cause of death. See, e. g., Wray M. Scott Co., Inc. v. Daigle, supra; Anderson v. St. Louis-S. F. Ry., supra.

 Appellant attacks the testimony of Dr. McPhee, who gave what might be considered contradictory statements. Appellant argues:

"Thus, Dr. McPhee's testimony at best was opinion evidence of 'possibility' in either direction—one direction supporting an accidental death and the other supporting death by disease process."

Aside from the fact that we believe that the testimony of Dr. Leitch was sufficient, when added to the testimony of Mrs. Berry concerning the circumstances of her husband's death, to justify the jury in arriving at the verdict it did, we nevertheless feel, as did Judge Hanson, that if Dr. McPhee's testimony was somewhat weakened by cross-examination, that went to the weight that should be given to his testimony and did not discredit it as a matter of law. The weight of the testimony is for the jury. See Kaltenheuser v. Sesker, 1963, 255 Iowa 110, 121 N.W.2d 672, 676, wherein the Supreme Court of Iowa stated:

"The defendants think this cross-examination destroyed the doctor's direct testimony that the ulcer was probably caused by the accident. We do not so understand it. The question asked on cross-examination dealt in possibilities, and it is understandable that the doctor could not say positively, beyond any question of proof, that the condition resulted from the accident. We doubt that medical science has yet advanced to that extent in the matter of definite causation of ulcers. We think the doctor's direct testimony, weakened perhaps by the cross-examination, was still for the jury to weigh."

See, also, Bathory v. Procter & Gamble Distributing Co., 6 Cir., 1962, 306 F.2d 22, 25; Campbell v. City of North Platte, 1965, 178 Neb. 244, 132 N.W.2d 876, 878–879. We repeat again that even if the testimony of Dr. McPhee was weakened or somewhat discredited on cross-examination, Dr. Leitch's testimony and the other evidence adduced at trial were sufficient grounds for the jury to arrive at the conclusion it did.

This case is in all things affirmed.