**Charles E. RADCLIFFE et ux., Appellants,**

**v.**

**The NATIONAL LIFE & ACCIDENT IN- SURANCE COMPANY, Appellee.**

**No. 13065.**

Court of Civil Appeals of Texas.

Galveston.

Jan. 17, 1957.

Rehearing Denied Feb. 7, 1957.

Hill, Brown, Kronzer & Abraham and Freeman M. Bullock, Houston, for appellants.

J. H. Burr, Houston, for appellee.

GANNON, Justice.

Charles E. Radcliffe and wife—plaintiffs below—appeal from a judgment denying recovery in their suit against The National Life & Accident Insurance Company as beneficiaries of a policy of insurance issued to their infant son, Charles D. Radcliffe, as assured and providing for the payment of death benefits upon proof of death caused directly and independently of all other causes by bodily injuries effected solely through violent, external, and accidental means, excluding, however, from coverage death resulting either directly or indirectly from bodily or mental infirmity or disease.

The assured died March 25, 1954, while the policy was in force, at the age of about eighteen months.

At the conclusion of plaintiffs' evidence, the defendant insurance company moved for an instructed verdict. This was over-ruled, and the case was then submitted to the jury on plaintiffs' evidence alone, without defendant's offering any proof. The special issue verdict finds that the assured's death occurred as a result of bodily injuries effected solely through violent, external, and accidental means; that such death occurred directly therefrom and independently of all other causes; and that such death did not result directly or indirectly, in whole or in part, from bodily infirmity or disease. in any form.

After the coming in of the verdict, plaintiffs moved for judgment on the verdict, but defendant moved for judgment non obstante veredicto. Plaintiffs' motion was denied. Defendant's motion for judgment non obstante was sustained, and judgment was entered accordingly.

Though we have concluded that the proof supports the jury's finding that the death of Charles D. Radcliffe did not result directly or indirectly, in whole or in part, from bodily infirmity or disease in any form, our study of the record convinces us that plaintiffs' proof does not support the finding that such death resulted directly and independently of all other causes from bodily injuries effected solely through violent, external, and accidental means.

Plaintiffs' proof establishes the following: On November 17, 1952, defendant issued its policy of insurance on the life of Charles D. Radcliffe, plaintiffs' infant son, naming the plaintiffs as beneficiaries of the policy. The applicable insuring clause reads as follows:

"Indemnity for Death By Accidental Means, As Defined Herein—

Upon receipt of due proof that during the continuance of this policy in force, the Insured has sustained bodily injuries effected solely through violent, external, and accidental means, and that such bodily injuries have directly and independently of all other causes, caused the death of the Insured within ninety days from the time such injuries were so sustained, the Company will pay to the Beneficiary named in the Schedule the Principal Sum less any amount paid or payable on account of the same injuries under the provision for indemnity for Specific Losses; provided, however, that no indemnity shall be payable if death results (i) from self-destruction, while sane or insane, (ii) from service in the military or naval forces of any country at war, (iii) from injuries intentionally inflicted upon the Insured by himself, or by any other person other than burglars or robbers, (iv) from the Insured's commission of, or attempt to commit a felony, or (v) directly or indirectly from bodily or mental infirmity or disease in any form, or medical or surgical treatment therefor."

For several days preceding his death, plaintiffs' infant son had been sick with the three-day Measles; but, the night before his death his fever left him and on the morning of the day of his death the baby was active and beginning to get well and was feeling good. However he was being kept in bed because Dr. McSpadden had so directed. Upon awakening the morning of his death, the baby was given his bottle but didn't have too much of an appetite. He took a little milk out of the bottle. This was about 8:00 or 8:30 in the morning. Later, about 10:00 in the morning, the baby drank some orange juice. Still later during the morning the baby was given a tablespoonful or two of chocolate ice cream. Throughout the morning the baby seemed to be all right. Though able to talk, he gave no indication of being nauseated or sick at his stomach or of feeling bad in any way. About 1:00 or 1:15 in the afternoon, upon coming into the room where the baby was lying, the mother discovered him looking pale and realized that something was seriously wrong. In fact, he had suffocated. The Harris Coun-

ty Emergency Corps was called in an effort to resuscitate the baby, but their efforts were unsuccessful. A post mortem examination revealed that the baby had died as a result of aspirating vomitus which caused asphyxiation or suffocation. The mechanical aspects of aspiration of vomitus are described by one of the doctors, as follows:

> "The mechanics of it, by the act of vomiting, the stomach contents are forced in the mouth and throat, and when the child tries to breathe, it is sucked back down into the lungs" and the infant smothers. The oxygen supply is cut off. The "acid contents of the stomach are very irritating to the lining of the throat and causes a swelling and reduces the amount of oxygen they can absorb."

Dr. Knittel, the pathologist who performed the autopsy, testified:

> "The outstanding finding in the autopsy was about an eighteen-months-old baby, and the outstanding feature of it was asphyxiation, and in the trachea and bronchi was material similar to that in the stomach, therefore, we reached the conclusion that due to regurgitation from the stomach, it got into the trachea and goes into the bronchi and in the air passage, and asphyxiation was the cause of death."

Dr. Knittel gave it as his opinion that "the actual cause of death was the asphyxiation." He described the material found in the trachea and bronchi as "a little mucous, and it was sort of light and dark brown with grayish flakes in it." In response to a question designed to elicit whether death from asphyxiation following aspiration of vomitus was relatively common, the doctor stated, "I would say we see quite a few young infants that expire with regurgitation from the stomach that causes asphyxiation." Dr. Knittel testified that he had no idea what

caused the baby to regurgitate in this particular case, putting it this way: "There may be a lot of causes, maybe the swallowing of air or maybe eating too much." The doctor stated also that an irritated condition of the stomach would cause regurgitation. But the doctor was emphatic that he had not settled on any specific explanation for the assured's regurgitation which immediately preceded his death. There is no indication or suggestion in the evidence that any of the food ingested by the assured at any material time was of deleterious or hurtful quality. At the autopsy, the material found in the trachea and bronchi was similar to or the same as that found in the stomach. There is testimony in the record that some time on the morning of his death the assured ate a small quantity of prepared crushed peaches, but the autopsy did not identify the presence, either in the stomach or in the trachea or bronchi, of any crushed fruit in identifiable form.

On the foregoing facts, plaintiffs contend that the food which the baby had ingested on the day of his death was the sole cause or means of his death, and that such food constituted a violent, external, and accidental means. We do not agree. In our opinion, the regurgitation and aspiration of the vomitus, each and both, were proximate and efficient causes, concurring with the stomach contents as an instrumentality or tool of such causes, to produce the asphyxiation which was the immediate cause of the assured's death, and plainly both the regurgitation and aspiration of vomitus were internal as distinguished from external causes or means of the death; and, even though it may be said that the *aspiration* of the vomitus was accidental, the regurgitation, in our opinion, was not.

■ It is clear from Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S. W. 673, 675, L.R.A.1916E, 945, that the term "means" employed in policies of the

type under consideration is used in the sense of cause as distinguished from instrumentality or tool. We quote: "The word 'means' is employed in the policy in the sense of 'cause' * * *." Additionally, it appears from the Bryant case that it will not do to deny "any standing as a 'means' to that which is essentially the cause, or in any event a very important part of the cause, * * *" of the casualty relied on to establish liability. In that case a contention of the insurance company that the operation of the rays of the sun was no part of the means or of the cause of sunstroke was rejected on the theory that such sun rays were "alone that which, in common understanding and in fact, makes the cause of a sunstroke 'external and violent.'" We quote further from the Bryant case: "In the numerous adjudicated cases upon the subject, therefore, it is determined that where by the terms of the contract the risk insured against is an injury effected by 'accidental means,' the element of accident must consist *in that which produces the injury,* rather than in the mere fact that an injury occurs." (Emphasis supplied.)

If, as we believe, the assured's vomiting or regurgitation must be given standing as a means, or in any event a very important part of the means or cause, of the assured's death, it cannot be said under our decisions, on the facts of this record, that such means or cause was accidental within the meaning of that term as used in the policy. Here, under the facts, the precise and exact cause of the regurgitation has not been determined. It may have been the swallowing of air, a natural phenomenon which all of us experience from time to time. It may have resulted from ingesting too much food and drink, a not uncommon occurrence; or it may have sprung from irritation of the lining of the stomach—again, a natural phenomenon—all purely internal causes. In any event, whatever precipi-

tated the regurgitation or vomiting was neither external nor accidental.

In International Travelers' Ass'n v. Ross, Tex.Com.App., 292 S.W. 193-194, a suit on a policy insuring against death from bodily injuries effected directly, independently, and exclusive of all other causes through accidental means—the pleading showed that the insured met his death from a rupture of a blood vessel; and the question was whether the rupture of the blood vessel was directly effected through accidental means independently and exclusive of all other causes. The petition alleged that the rupture followed and was caused by straining in vomiting, caused by nausea which followed the assured's partaking of a heavy dinner of rich food. The court said:

"That the sickness or stomach disorder suffered by Ross was the direct cause of the rupture of the blood vessel plainly appears from the allegations of fact in the petition. Ross suffered an attack of nausea. The nausea, and its natural consequence of straining in vomiting, resulted directly in the rupture of the blood vessel, without the intervention of any other cause or agency. *It is of no importance that the rupture of the blood vessel was unexpected or was an unusual result of nausea and the consequent straining in vomiting.* Vomiting and straining are the natural and usual accompaniments of nausea, and are as much a part of the sickness resulting from the derangement of the stomach as is the distressed feeling produced in the stomach itself. There can be no escape from the conclusion that the rupture was the direct and proximate result of the sickness or physical disorder suffered by Ross, and that no other independent cause or agency intervened to produce the injury, or even to contribute to the injury. * * * (Emphasis supplied.)

"Sickness, of itself, does not comprehend the element of accident, according to popular conception. It is a physical condition which, in the ordinary course of events, every human being must be expected to undergo at some time and in some degree. The history of human existence proves this to be so. A particular attack may be unexpected or unforeseen, both in occurrence and result, but this fact does not render the sickness accidental. Therefore sickness can never be regarded as the 'accidental means' of effecting a bodily injury, or of itself being accidental, unless the sickness be proximately caused by a bodily injury accidentally sustained. In view of these considerations, it may be stated, as a rule of law governing accident insurance, that bodily injuries, of which sickness is the sole efficient cause, are not effected through 'accidental means,' hence do not come within the scope of such a provision of an accident insurance policy as we have under consideration here."

We are unable to see how, as contended by appellants in the instant case, food, or rather the stomach contents, may be be said to be the sole cause, independently of all other means or causes, of the asphyxiation which led to the assured's death. The contention parallels that rejected in the Ross case, i. e., that the rich food which caused the assured's nausea was the sole efficient cause of his bodily injury producing death, i. e., the rupture of the blood vessel. If it be contended that the aspiration or sucking in of the vomitus into the lungs was an independent cause or agency of the asphyxiation which produced death, still it cannot logically be contended that such aspiration was external. Accidental it may have been, but external it clearly was not. Be that as it may, the means or cause which produced the vomiting or regurgitation of the contents of the assured's stomach here was

not accidental. International Travelers' Ass'n v. Ross, supra.

Appellants rely for direct authority upon the Indiana case of Peoples Life Ins. Co. v. Menard, Ind.App., 117 N.E.2d 376, 379, by the Appellate Court of Indiana. In that case on facts—so far as legally material—indistinguishable from those on this appeal, the majority held the lodging of the food in the decedent's windpipe to be the sole accidental means causing his death. The court said: "If the regurgitation had been a perfectly normal process as it normally occurs the decedent would have expelled the contents of his stomach in a perfectly normal manner and no unforeseen, unexpected or unusual contingency would have occurred, and decedent would not have suffered the asphyxiation which was the immediate cause of his death. Normal regurgitation results in no untoward, unforeseen happening as in the instant case. Here, the food [we interpolate because of aspiration] became lodged in the windpipe of the decedent creating a localized abnormal condition of the living body and resulted in his death. The accidental means, to wit: the lodging of food, which was accidental and contrary to nature, thereby caused a perfectly normal healthy person to die." The Indiana court distinguished the Ross case, supra, as follows: "In that case the decedent died from a ruptured blood vessel which resulted from the act of vomiting. There was no external means nor unforeseen happening such as the lodging of food in the windpipe as in the instant case. In the instant case, if the food had been expelled to the outside of decedent's body or it had gone back to his stomach and still the insured would have died because of the failure of some bodily function there would have been no accidental means. However, here there was a mishap due to the mechanical action of food in that the same became lodged in his windpipe, thereby causing his death. The lodging of the food in the windpipe was an intervening agency of a violent character which was the proxi-

mate cause of his death, and an intervening agency within the doctrine and principles of the Indiana cases."

Nevertheless, we are unable to reconcile the result reached by the Indiana court with the principles announced by our own Supreme Court in the Bryant case, supra, which require us to give proper standing to all elements of the actual cause, or substantial parts of the cause, of death; because when we do so, and take into consideration the regurgitation here involved, we cannot say that such cause is either accidental or external. And not only that, in order to sustain a recovery for plaintiffs we would have to disregard entirely as a cause or means of the assured's death the accidental sucking in of the food and fasten upon the food itself—inert matter incapable of imminent action—as the sole cause of death, because when we give any effect to the sucking in or aspiration of the vomitus as a cause we are immediately met with an internal rather than an external cause. Judge Achor's dissenting opinion in the Menard case, concurred in by Chief Justice Crumpacker, emphasizes the regurgitation and the aspiration of vomitus as purely internal means, stating that, "the evidence does not support the fact of injury and death through *external* means." We consider germane the following additional quotation from the dissenting opinion: " * * * in this case, injury occurred while the food was being regurgitated from the inside of the body to the outside, and there was no evidence that the nature of the substance *as it was consumed* was the proximate cause of the regurgitation." (Emphasis supplied.) In the present case there is no evidence that any food involved was deleterious or noxious. It, therefore, cannot be said that the food of itself even set in motion any of the real causes which actually produced the death of the assured. Food is inert matter; it could not and did not reach the assured's trachea and bronchi in and of itself, unaided and unmoved by other causes or means. On the other hand, food reached the assured's breathing apparatus only through the force of and because of the assured's internal regurgitation or vomiting, coupled with the assured's internal and unfortunate aspiration, or breathing in of the vomitus.

Our principal difficulty in following the reasoning of the majority of the Indiana court is in attempting to think of "the lodging of the food" in the windpipe as the sole cause of death. Lodging as we conceive it is the result or effect of a cause rather than a cause itself. That the Indiana court thought of "the lodging of the food" in the windpipe as the sole cause or active agency producing death—a thought we are unable to embrace—is evident from the following sentence in the opinion of the majority: "The lodging of the food in the windpipe was an *intervening agency of a violent character* which was the proximate cause of his death, and an intervening agency within the doctrine and principles of the Indiana cases." (Emphasis supplied.) We do not concur in the concept of non-noxious, wholesome food as violent or that when moved by forces outside itself food may be said to constitute a sole agency. Agency implies activity and force. We are convinced that the food here was rather a tool or instrumentality of extraneous forces —not in and of itself, and without being first moved, an agency in the sense of cause or means, as ruled in Bryant v. Continental Casualty Co., supra.

We hold that the facts do not show death resulting from bodily injuries produced solely by a cause or causes at once violent, external, and accidental, because in our view assured's death was produced, in substantial part, at least, by causes which were legally not external and one of which, at least, was not accidental.

Affirmed.