**COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY, a Corporation, Appellant,**

v.

**Edwin Scott ORR, Appellee.**

**No. 18611.**

United States Court of Appeals
Eighth Circuit.

July 11, 1967.

Rehearing Denied Aug. 25, 1967.

Wilburn A. Duncan, St. Louis, Mo., for appellant. Robert R. Young, St. Louis, Mo., with him on the brief, together with John L. Hearne, Jefferson City, Mo.

Carl F. Sapp, of Orr, Sapp & Woods, Columbia, Mo., for appellee. Larry M. Woods and Fred Dannov, Columbia, Mo., with him on the brief.

Before VOGEL, Chief Judge, and GIBSON and HEANEY, Circuit Judges.

VOGEL, Chief Judge.

Commercial Insurance Company of Newark, New Jersey, defendant-appellant, issued an accident policy on March 13, 1962, wherein Edwin C. Orr, father of plaintiff-appellee, Edwin Scott Orr, was the named insured and plaintiff-appellee was the beneficiary as well as the designated owner of the policy. Yearly renewals kept the policy in force during all the times hereinafter considered.

On April 11, 1964, the insured, Edwin C. Orr, died as the result of "aspiration of vomitus due to acute alcoholic gastritis". Plaintiff-appellee made claim under the aforesaid policy and, upon denial of such claim, instituted this action, asserting that the cause of death of Edwin C. Orr was "suffocation due to aspiration of vomitus" and that "his death was caused by drowning and by asphyxiation". After having been removed from state court because of diversity of citizenship and amount involved, the case was tried to a jury in the United States District Court for the Western District of Missouri. This action resulted in a verdict and judgment in favor of plaintiff-appellee in the amount of $100,000, the face amount of the policy, plus interest. Motions for judgment notwithstanding the verdict or for a new trial having been denied by the District Court, timely appeal was taken.

Appellant's primary contention in this court is error on the part of the trial court in failing to sustain its motion for a directed verdict. It claimed that the insured's death did not result "directly and independently of all other causes from accidental bodily injury" within the insuring clause of the policy; that the insured's death was a direct and proximate result of his voluntary and wanton exposure to unnecessary and known danger; and that the evidence affirmatively established that death was the result of "intentionally self-inflicted injuries" and accordingly excluded from coverage.

We affirm the action of the District Court.

■ In the consideration of this appeal, we must take that view of the evidence which tends to support the conclusion of the jury and we accept as established all reasonable inferences favorable to that result. See, e. g., Lavender v. Kurn, 1946, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916; Commercial Union Assur. Co. v. Berry, 8 Cir., 1966, 359 F.2d 510, 516; State Farm Mutual Automobile Ins. Co. v. Jackson, 8 Cir., 1965, 346 F.2d 484, 487; Anglen v. Braniff Airways, Inc., 8 Cir., 1956, 237 F.2d 736, 740.

The policy contract with which we are here concerned provides for the payment of benefits for loss as follows:

### "INSURING CLAUSE

"This *policy insures* against specified *loss* described in Part I *resulting directly and independently of all other causes from accidental bodily injury* occurring during any term of this policy, being hereinafter referred to as 'such injury.'" (Emphasis supplied.)

It also provided:

"The insurance under this policy shall not cover loss caused by: 1, intentionally self-inflicted injuries, sui-

cide or any attempt thereat, while sane or insane; * * *."

A rider attached to the policy and called "Missouri Amendment Rider" stated:

"The provisions of this Policy are hereby amended as follows:

"If or wherever suicide, sane or insane or any attempt at suicide, sane or insane, is mentioned in this policy such reference is entirely deleted from the policy."

The policy contained no provision that the "loss" must come from *violent* or *external* means.

The testimony indicated that the insured, Edwin C. Orr, a very intelligent person who was a practicing attorney, had for a number of years prior to the issuance of the policy and at the time of the issuance thereof suffered from the disease of alcoholism for which he had been hospitalized on many occasions. On April 4, 1964, Orr suffered a broken ankle and was confined in a hospital from that date until April 7th, under the care of Dr. William J. Stewart. At the time of his death he was confined at home, convalescing from the broken ankle but nevertheless working on some of his office files.

Edwin Scott Orr, plaintiff-appellee and son of the insured, testified that on the evening before his father's death he saw him in his room about six o'clock, again at about ten o'clock that evening and again around two o'clock the following morning of April 11th. At about nine o'clock that morning he found his father dead. When seen at six o'clock in the evening, his father appeared "normal", "everything was fine" and his father was not then intoxicated. At ten o'clock when he came home to change clothes, he saw his father long enough to take him some ice and exchange comments with him. At that time he saw a bottle of Scotch and could tell that his father had taken "a couple of drinks", although he "talked fine". His father was lying in bed reading one of his office files and "he'd been drinking at that time and had been vomiting and drinking water".

Around two o'clock the following morning he heard a noise in the room downstairs in which his father was sleeping and, thinking that his father might have fallen while trying to get something, he got up to see if his father needed help. He found his father lying in bed as before. Upon inquiry, his father answered, "Something to the effect, 'Oh, yeah, all right, everything's all right.'" He noticed nothing unusual. On cross-examination, he admitted that his father "drank a lot of alcohol over the years" and that he was hospitalized on several occasions where he was treated for "chemical unbalance".

Dr. Richard E. Johnson, specialist in pathology and coroner for Boone County, Missouri, testified that he performed an autopsy upon the body of the insured. He stated:

"The most striking finding was the presence of vomitus around the mouth and on the hands of the deceased; the presence of fluid of vomitus in the mouth and tracing on down through the larynx, the voice box, the trachea, and the bronchi; the air passage down to the lungs all contained vomitus."

He was asked:

"Q. Did you make a determination as to the direct, efficient and procuring cause of death of Mr. Orr?

"A. Suffocation due to the presence of vomitus in the respiratory tract.

"Q. Well, now, you said 'suffocation due to the presence of vomitus'. Then the direct cause of death was what?

"A. Suffocation is the direct cause.

"Q. And this was due to the aspiration of vomitus?

"A. He aspirated the vomitus, yes, sir, blocking the air passages.

"Q. When you say 'aspiration', what do you mean by aspiration?

"A. Well, inhaling material other than normal air into the lungs is called aspiration.

"Q. When you speak of 'suffocation', what do you mean? What are the forms of suffocation?

"A. Well, suffocation is a form of asphyxia; asphyxia is cutting off of the oxygen to the individual. Suffocation is the cutting off of oxygen supply by some mechanical blockage of the air passages.

"Q. What are the types and kinds of asphyxiation that you've been acquainted with as a doctor?

"A. Of asphyxia?

"Q. Yes.

"A. Well, of course, strangulation —these mechanical ones, strangulation, drowning, aspiration of foreign material, including vomitus.

"Q. What is the difference, if any, between the aspiration of vomitus and drowning?

"A. The basic mechanism is essentially the same, the blockage of the air passages by fluid."

Dr. Johnson further testified that his autopsy disclosed the insured to be in "a good state of nutrition"; that his liver appeared normal and he found no degeneration thereof. He found the lining of the stomach inflamed, indicating that the deceased had gastritis; that the gastritis "probably caused him to vomit"; that vomiting is " * * * a rather frequent, common symptom of acute gastritis"; that in the normal process of swallowing or of vomiting, the glottis closes to prevent aspiration of the material that is being swallowed or vomited; that this is by reflex action. He stated:

"A. The epiglottis is an anatomic structure; its sort of a—looks like a flat, that's attached at the base of the—at the base of the tongue and can—it forms a shield in front of the air passage to divert material that is being swallowed around rather than letting it pour over the opening of the air passage, it diverts the material around it."

He testified that the epiglottis operates by reflex action entirely, that aspiration of vomitus is not a natural thing—it is not usual, and it is undesigned. It is, " * * * not foreseeable by the victim".

Plaintiff-appellee's attorneys then read to the jury two stipulations between the parties as follows:

"It is stipulated and agreed that the policy contract in issue was solicited by the defendant from the insured with no requirement that the insured have a physical or medical examination.

"That the policy contract in issue did not require the insured to cease or abstain from the use of intoxicating beverages."

Defendant offered the testimony of but one witness, Dr. Donald A. Senhauser, who was also a medical doctor specializing in pathology. Among other things, he testified as follows:

"Q. Doctor, among deaths of chronic alcoholics is aspiration of vomitus a common or expected finding?

"A. It is a common or expected finding, yes, sir.

"Q. You would not say it was an unusual finding among chronic alcoholics?

"A. It is not unusual in the sense that when one does a post-mortem examination of a patient who is acutely intoxicated, or has been acutely intoxicated with alcohol or who has a long history of alcoholism, this is one of the things that one looks for when doing this autopsy.

"Q. And is that why you would describe it or would you describe it as an expected finding in cases of prolonged use of alcohol or acute alcoholism?

"A. One is not surprised when one finds this, it is not so unusual that one is surprised by it.

"Q. Would you say that it is a not foreseeable result of the continued use of alcohol?

"A. It is foreseeable in the medical sense.

"Q. Would you say that it is one of the foreseeable results of chronic alcoholism, doctor?

(Objection overruled.)

"A. Yes, sir."

He further stated that the findings in the post-mortem examination would indicate to him that the patient had imbibed large quantities of alcohol just prior to his death. He was asked:

"Q. Doctor, would the fact that a person aspirated—under the facts that I asked you to assume—would that indicate whether or not the reflexes were fully active?

"A. To me—

(Objection overruled.)

"A. If I had performed such an autopsy this is certainly the explanation that I would use to explain the aspiration of vomitus, yes, sir; there would be a depression of the reflexes.

"Q. Would that imply to you that they were depressed?

"A. It would imply to me that, yes, sir."

Under cross-examination he testified:

"Q. You said awhile ago that you would reasonably expect people who regurgitated to awaken, ordinarily, isn't that correct?

"A. Yes, sir, that is correct.

"Q. That's the natural thing for people to do, isn't it?

"A. Yes, sir.

"Q. Then when a person doesn't awaken or when he doesn't recover or is not able to regurgitate, that's not natural, is it; not able to throw it out of his mouth is not natural?

"A. That is correct, sir.

"Q. As a matter of fact, a gag reflex sometimes works in unconscious people, doesn't it?

"A. This depends on the level usually rather than conscious effort, if I use the word central nervous system depression, if that's all right with you, sir.

\* \* \* \* \* \*

"Q. Doctor, you said one is not surprised to find a person who drinks alcohol to excess to die in this manner. Isn't that what you said?

"A. That is correct, sir.

"Q. And you meant that, also, from a medical standpoint, didn't you?

"A. I did, sir.

"Q. From a medical standpoint you would not be surprised to find a newborn infant dying in the same manner, would you, without any alcohol at all?

"A. It happens in newborns, yes, sir.

\* \* \* \* \* \*

"A. It is for precisely the same reason that one sees in an alcoholic, sir, that in very young infants and premature infants their reflexes are not well-developed and therefore the gag reflex or protective reflex is not present or is diminished."

At the conclusion of the testimony motions for a directed verdict were made by each party and denied by the trial court. After being instructed, the jury returned its verdict for the appellee. In arriving at its verdict, the jury obviously concluded as a fact that the insured's death resulted "directly and independently of all other causes from accidental bodily injury"; that aspiration of vomitus was not a natural thing, that it was unusual, not foreseeable or could not have been reasonably anticipated by the insured as the natural or expected result of his consumption of alcohol.

The appellant states the issue on appeal to be this:

"Is a death caused by aspiration of vomitus due to acute alcoholic gastritis and chronic alcoholism within an insurance policy covering injuries 'resulting solely and independently of all other causes from accidental bodily injury'?"

The provisions of the policy contract with which we are here concerned are unusually broad in scope and provide for payment of "loss" (in this in-

stance, death) "resulting directly and independently of all other causes from accidental bodily injury occurring during any term of this policy * * *". Under Missouri law, which controls herein, "causes" as used in the policy is synonymous with "means". To recover under Missouri law the cause or means must be accidental. An unexpected or accidental result obtained through normal means will not support recovery. Aubuchon v. Metropolitan Life Ins. Co., 8 Cir., 1944, 142 F.2d 20, 25. We said in Aubuchon, at page 25:

" * * * Missouri holds that 'the word "means" * * * is equivalent to cause'; that 'where the means which causes the injury was voluntarily employed in the usual and expected way, the resulting injury is not produced by accidental means, even though such resulting injury is entirely unusual, unexpected, and unforeseen'; and that 'where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means'. Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907, 921, 908, 39 A.L.R. 56. See too Pope v. Business Men's Assur. Co., 235 Mo. App. 263, 131 S.W.2d 887, and also United States Mutual Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60, cited with approval by the Missouri courts. In Missouri, therefore, death which is merely the unexpected result of a wholly intentional act is not a death from accidental means. *To constitute the means accidental in such a case, some causative mischance, slip or mishap must have occurred in connection with the intentional act.*" (Emphasis supplied.)

In that case, which was tried to the District Court without a jury and resulted in a judgment therein for the defendant insurance company, the insured had taken an overdose of barbital or veronal tablets to alleviate pain in one of his legs. Cause of death was recorded as "acute drug intoxication". This court stated, at page 24:

"In the present case, we believe that whether the insured's death from barbital or veronal was a death from poison was, under Missouri law, properly a question of fact and not of law. It certainly can not be declared as a matter of law that barbital is absolutely recognized as a poison by general public concept. In addition, the record here contains conflicting expert opinion and other circumstances from which different inferences can be drawn."

And at page 26:

" * * * If the circumstances can be said to be such as reasonably to permit of an inference that by some mischance, slip or mishap he took a greater quantity than he intended or realized, then his death might properly be found to be one from accidental means. But, whether the insured took the number of veronal tablets that he intended, or whether some mischance, slip or mishap occurred so that he was not aware of the quantity he was taking, the question was at most one of inference and fact for the trial court. On the evidence, we can not say that the court's finding that the death here did not result from accidental means is clearly erroneous, and it must accordingly be permitted to stand."

We accepted the findings and inferences therefrom made by the trial court sitting as the fact finder. In the instant case the determination of accidental means resulting in death must, in order to allow a recovery, be based on some evidence or inference or inferences therefrom that some mischance, slip or mishap, entirely unanticipated, occurred in connection with the intentional act of drinking whiskey. It is not enough that death be merely the unexpected result of a wholly intentional act. We are confined to "accidental means". The en banc holding of the Supreme Court of Missouri in Caldwell v. Travelers' Ins. Co., 1924, 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56, as set forth in *Aubuchon*, supra, is

still the law in that state. See, State Farm Mutual Automobile Ins. Co. v. Underwood, Mo.Sup., 1964, 377 S.W.2d 459, 464; Callahan v. Connecticut General Life Ins. Co., 1947, 357 Mo. 187, 207 S.W.2d 279, 283–284. In *Underwood*, supra, the insured died because of cardiac arrest following an operation on his back. After a verdict and judgment against the insurance company, the Supreme Court of Missouri, again sitting en banc, and finding a failure of medical testimony to support the verdict, stated at page 464 of 377 S.W.2d:

> "The present judgment might be reversed without remand. We have held, however, that where it appears that the evidence has not been fully developed, it is permissible to remand the case. We shall do so here, in order that defendant may develop by expert medical testimony, if so advised and if such testimony is available: (1) the medical necessity for the operation in question as the regular and proper treatment, and (2) the cause of the cardiac arrest, with its ensuing complications."

We have no such insufficiency of medical testimony in the instant case. Concededly, death was caused by suffocation brought about by the presence of aspirated vomitus in the respiratory tract. Aspiration is the inhalation into the lungs of material other than normal air, thus shutting off oxygen and causing suffocation through mechanical blockage of the trachea or windpipe. The aspiration here resulted from failure of the epiglottis to perform its usual function of closing over the opening of the air passage during swallowing or regurgitation. Dr. Johnson testified that the epiglottis works by reflex action entirely; that aspiration of vomitus is not a natural thing. It is not usual and it is undesigned. It is " * * * not foreseeable by the victim". In other words, the accidental means which resulted in death was the unanticipated failure of the epiglottis to close the air passage and prevent material other than air going into the tubes and the lungs. The testi-

mony of Dr. Johnson was, however, not unchallenged. Dr. Senhauser, called by the appellant, gave it as his opinion that aspiration of vomitus was a common or expected finding in deaths of chronic alcoholics; that it was not unusual to find such to be the situation; that, from a medical standpoint, one is not surprised to find a person who drinks alcohol to excess to die in this manner.

There is no testimony in the record or inference from testimony that the insured had any knowledge that the continuous use of alcohol might depress his reflexes to the point where they would not operate and he become the victim of aspiration of foreign material into his windpipe and lungs. While there can be no question but what the consumption of alcohol here was voluntary, no inference arises from the testimony from which a court could say, as a matter of law, that the insured's death was caused by voluntary exposure to a known and anticipated hazard and that death was, therefore, not caused by accidental bodily injury. Certainly the contradiction in the testimony by the two medical experts left for the jury the determination of the facts and the drawing of reasonable inferences from the evidence.

Appellant cites to us a number of cases from other jurisdictions where deaths resulted from aspiration of vomitus. In each instance the policy involved required death to be from *"external violent* and *accidental means"*. We are not dealing here with an *"external means"* insuring clause but with an "accidental bodily injury" insuring clause. Some of the cases relied upon by the appellant turn squarely on the use of the word "external", holding that death caused by aspiration of vomitus was not from "external" means, drawing the distinction between food that had been swallowed and then regurgitated as being "internal", whereas food swallowed during the process of eating and gotten into the windpipe accidentally as being "external".

In one of the cases cited by the appellant, McCallum v. Mutual Life Ins. Co.

of New York, D.C.Va., 1959, 175 F.Supp. 3, the Court of Appeals, when affirming, 4 Cir., 1960, 274 F.2d 431, adopted the opinion of the District Court on the main question regarding the interpretation of "external means". This action involved the death of an insured where the diagnosis was "acute aspiration of gastric contents to trachea, bronchi and bronchioles; acute congestion of lungs; marked mucous and tracheal bronchitis; severe fatty infiltration of liver; hypertrophy of left heart; moderate coronary sclerosis; adiposity of heart; moderate arteriosclerosis of aorta; chronic gastritis; blood alcohol, *negative*." Beginning at page 5 of 175 F.Supp. the court therein stated:

> "*The case*, as presented by the motion, *turns on the interpretation of the words 'external means'*. Certainly if this matter is ultimately submitted to the jury, it would be incumbent upon the court to define this term. The defendant urges that the cause of death was the failure of the glottis to function properly with the result that vomit was taken into the windpipe and bronchi. Plaintiff, on the other hand, contends that the cause or means of death was aspiration of vomitus, or suffocation on vomited matter. *Undeniably, death caused by choking on food which, in an attempt to swallow it, accidentally passes into the windpipe is covered under a contract which provides for payment by reason of 'external, violent and accidental means'*.

> "*The ultimate question is to the distinction, if any, between choking on food as it is being ingested, and choking on food reduced to matter as it is regurgitated from the stomach*." (Emphasis supplied.)

At page 7 of 175 F.Supp. the court therein said:

> " * * * To the extent that Menard [Peoples Life Insurance Co. v. Menard, 124 Ind.App. 606, 117 N.E.2d 376, 380] may support an 'external means' where food has passed into the stomach and regurgitated after changing into matter, this Court disagrees. *The substance, as contained within the stomach, was inside the body and on its way outside during the vomiting process. This, in no sense, constitutes an 'external means'*." (Emphasis supplied.)

Also in Radcliffe v. National Life & Accident Ins. Co., Tex.Civ.App., 1957, 298 S.W.2d 213, the court was dealing with an infant whose death was caused by the aspiration of vomitus. The policy there provided for death because of bodily injuries effected solely through violent *external* and accidental means. The court said, at page 217 of 298 S.W.2d:

> " * * * If it be contended that the aspiration or sucking in of the vomitus into the lungs was an independent cause or agency of the asphyxiation which produced death, still it cannot logically be contended that such aspiration was external. *Accidental it may have been, but external it clearly was not*." (Emphasis supplied.)

And at page 218 of 298 S.W.2d:

> "We hold that the facts do not show death resulted from bodily injuries produced solely by a cause or causes at once violent, external, and accidental, because *in our view assured's death was produced, in substantial part, at least, by causes which were legally not external and one of which, at least, was not accidental*." (Emphasis supplied.)

Appellant, relying upon this "external means" authority, now apparently claims that although the insurance contract it sold to insured did not embody "external violent and accidental means" language, recovery should only be allowed if there was such an external and violent occurrence. The imposition of an external means requirement on the insuring clause of the Orr policy which insured simply on the basis of "accidental bodily injury" would amount to the judicial construction of the insurance policy in favor of the insurer. This violates the cardinal rule stated by Mr. Justice

Sutherland in Mutual Life Ins. Co. of New York v. Hurni Packing Co., 1923, 263 U.S. 167, at page 174, 44 S.Ct. 90, at page 91, 68 L.Ed. 235:

> "The rule is settled that in case of ambiguity that construction of the policy will be adopted which is most favorable to the insured. The language employed is that of the company and it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against it."

This principle has been continually recognized. See, Stipcich v. Metropolitan Life Ins. Co., 1928, 277 U.S. 311, 322, 48 S.Ct. 512, 72 L.Ed. 895; Roth v. Western Assurance Co., 8 Cir., 1962, 308 F.2d 771, 774; McNally v. American States Ins. Co., 6 Cir., 1962, 308 F.2d 438, 445; Consolidated Electric Cooperative v. Employers Mut. Liability Ins. Co., D.C.Mo., 1952, 106 F.Supp. 322, 327. If the court in the instant action must judicially construe the insurance policy, such construction should be in favor of the insured rather than the insurer.

A recent Eighth Circuit case, Commercial Union Assur. Co. v. Berry, 8 Cir., 1966, 359 F.2d 510, is cited by appellant in support of its claim that the death involved herein did not come under the insuring clause of the Orr policy. In *Berry*, this court upheld the jury's finding that death resulted from an accident within the meaning of the policy insuring clause. Although there was substantial conflicting medical testimony as to whether the exact cause of death was heart disease or an accidental fall, as in this case, the jury resolved the question in favor of the plaintiff, finding that the accidental fall caused acute aspiration which resulted in death. Because external trauma, a fall, was present in *Berry*, appellant erroneously assumes that all cases must involve similar external trauma to permit recovery under an accident insurance policy. It is, of course, necessary to examine the insuring clause of the policy to determine if external trauma is a requisite of recovery. An examination of the Orr policy reveals no external means requirement. Therefore, *Berry* lends no support to appellant's argument on this point.

Both parties cite, each to its or his own purpose, the recent case of Malanga v. Royal Indemnity Co., 1967, 101 Ariz. 588, 422 P.2d 704. In such case the insured voluntarily and intentionally consumed intoxicating beverage or beverages which contained alcohol and he also voluntarily and intentionally consumed three or four pills containing sodium amytal.

> " * * * The deceased did not intend to injure himself or to cause his death; apparently he did not suspect, or know, or have reason to know that consumption of the alcohol and barbiturates in the quantities taken would result in injury or death." (Pages 705–706 of 422 P.2d.)

The insurance contract provided against loss " * * * *resulting directly and independently of all other causes from accidental bodily injuries sustained * * *"* (page 706 of 422 P.2d)—the exact wording of the policy with which we are here concerned. The trial court, sitting without a jury, rendered judgment in behalf of the insurance company and the Court of Appeals affirmed. The Supreme Court of Arizona, sitting en banc, unanimously reversed and directed judgment in favor of the beneficiary. In so doing, the Supreme Court stated at page 707 of 422 P.2d:

> " * * * we find that when the central nervous system of Jack Ellis was dulled to the point where automatic breathing and heartbeat were not sufficiently stimulated, so as to sustain life, the deceased incurred a 'bodily injury' within the meaning of the policy. In the sense in which the term 'bodily injury' is ordinarily used and understood, we think it is impossible to conclude otherwise. *When a body is so affected that its normal functions are interfered with to the point where death results, the body has been injured.*" (Emphasis supplied.)

And at page 708 of 422 P.2d:

" * * * There is no evidence that the 'insured, as a reasonable man', expected or anticipated or desired the injury which resulted from his voluntary acts. He was not attempting to commit suicide or to injure himself. He did not suspect, or know, or have any reason to know that alcohol and barbiturates, when consumed in the quantities which he took, would produce an injury resulting in death. Both the injury and the death were 'accidental', as the term is commonly used and understood."

■ The trial judge in the instant case was faced by a conflict of expert testimony offered by Dr. Johnson and Dr. Senhauser. Dr. Johnson testified that the aspiration of vomitus was not a natural thing and that it was unusual and not foreseeable, while Dr. Senhauser expressed himself as being of the opinion that it was not unexpected, that a doctor performing an autopsy on one whose death occurs under conditions caused by alcoholism is not surprised to find this situation and that it was foreseeable from a medical standpoint. Therefore the trial judge left to the jury the determination of whether or not the deceased should have known what to expect from his overindulgence in alcohol and whether or not the failure of the epiglottis to close the air passage was something that might have been expected to reasonably follow from his acts. The question of what a reasonable man could anticipate under the conditions existing here and whether a reasonable man should have foreseen the failure of the epiglottis to close as it normally would have was peculiarly for the jury. There is no evidence that this had previously occurred or that the insured, in spite of his extensive drinking, had experienced any failure of his natural reflexes. The opinions of the two experts who testified on the point were contradictory. We believe the trial court was entirely correct in leaving for the determination of the jury whether or not the failure of the epiglottis to close, causing suffocation and resulting death, was an unusual, unexpected and unforeseen happenstance.

We are satisfied that at the very best the appellant on this point raises a question of the law of Missouri and we cannot say that the interpretation of Missouri law placed upon it by the distinguished trial judge is not an acceptable one. See, e. g., Universal Underwriters Insurance Co. v. Wagner, 8 Cir., 1966, 367 F.2d 866, 873; H. K. Porter Co. v. Wire Rope Corporation of America, Inc., 8 Cir., 1966, 367 F.2d 653, 662; Carman v. Harrison, 8 Cir., 1966, 362 F.2d 694, 701. A great many other cases cited by the appellant in its behalf are distinguishable on the facts involved here and are not relevant under the law of the State of Missouri. Appellant must fail on this point.

■ Appellant's next contention involves the rejection by the trial court of certain hospital records showing prior confinements of the insured for alcoholism. The receipt of such records, covering remote occurrences, addressed itself peculiarly to the discretion of the trial judge. Additionally, it was merely cumulative, the jury being well advised of the fact that the insured suffered from alcoholism for which he had been hospitalized many times. The record also indicates that the insured's alcoholism was a known fact prior to the time of and at the time of the issuance of the policy, and yet no exclusion was provided for in the contract.

We have carefully reviewed the court's instructions of which complaint is made and find therein no prejudicial error.

This case is affirmed.