Louise B. COBB, et al., Respondents,

v.

AETNA LIFE INSURANCE
COMPANY, Appellant.

No. 48003.

Supreme Court of Minnesota.

Jan. 12, 1979.

Faegre & Benson and Wright W. Brooks
and Ludwig B. Gartner, Jr., Minneapolis,
for appellant.

Briggs & Morgan and John R. Kenefick, St. Paul, for respondents.

Heard before PETERSON, TODD, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal by defendant, Aetna Life Insurance Company (Aetna), from three separate judgments of $97,576.84 each in favor of plaintiffs Louise B. Cobb,[1] Josephine B. Carpenter, and George B. Benz.

George W. Benz (hereafter the insured) died on June 22, 1974, at the age of 68. At the time of death he was an insured under a group policy issued by Aetna[2] providing accidental death benefit coverage. Under the terms of the policy, Aetna agreed to pay the sum of $250,000 upon proof of accidental death. The insured's three children were the beneficiaries of this insurance policy. Subsequent to their father's death they filed a claim with Aetna for the face amount of the policy. Aetna denied the application for benefits, claiming that the death was not accidental, and the beneficiaries commenced this action in Ramsey County District Court.

The action was tried to a jury, which found by special interrogatory that the insured had suffered a bodily injury caused by accident which directly caused his death, to the exclusion of all other causes. The trial court immediately ordered separate judgments in favor of each plaintiff for one-third of the face amount of the policy, plus interest. The court denied defendant's motions for judgment notwithstanding the verdict or for a new trial. We affirm.

George W. Benz' death was unexpected. His only persistent health problems in the years prior to his death were a disorder of the nerves in the skin of his feet (peripheral neuritis),[3] and a slight depression.[4] Otherwise, in the year prior to his death, he did not bring any health problems to the attention of his physician.[5]

In the weeks prior to his death, the insured was, by all outward appearance, in good health and maintained his normal business schedule. On the evening prior to his death the insured and his wife, Louise Benz, met with friends to plan an upcoming fishing trip to Iceland and have dinner. He appeared to be in his normal state of health and was quite enthusiastic about the trip. The insured and his wife were home and in bed by 11:00 p. m. He was not ill during the night.

The insured awoke between 7:30 and 8:00 on Saturday morning, June 22, 1974. After a breakfast of juice, toast, fruit and coffee, he busied himself around the house and yard. Late in the morning, Louise Benz left to visit their son; she spoke with her husband before she left. She returned home in approximately one hour. After calling to her husband and receiving no response, she began looking for him. She found him seated erect on a small settee in the basement. His eyes were open, he had his glasses on, and he had books and papers in his lap. He did not respond to his wife, and she could not rouse him. At trial she testified:

"* * * I couldn't rouse him, so I thought I would try to make him a little more comfortable. So I went to put his head down on this little settee on which he was sitting, and I noticed some yellow-

1. Subsequent to the bringing of the action Louise B. Cobb has remarried and taken the name of Louise B. Plank.

2. George Benz & Sons, doing business as the Oak Grove Dairy, was the certificate holder of a master policy issued to the Minnesota Association of Commerce and Industry.

3. By 1973 this was being treated through the use of a small electric stimulator and acupuncture treatments.

4. Controlled by a mild tranquilizer.

5. Dr. Francis Tiffany was the insured's personal physician. He first examined the insured in May of 1968. At that time his primary findings were high blood pressure, an enlargement of the liver due to a problem with alcohol dependency, a weight problem, and mild diabetes. Prior to his death, however, Mr. Benz had made substantial progress in ridding himself of alcohol dependency, his blood pressure was normal, and his diabetes was controlled by diet.

brownish sera stuff run out of his mouth, and kind of a liquidy thing, and just put his head down and went immediately to call the Fire Department * * * ."

Chief Gordon Vadnais of the White Bear Lake Fire Department and Rescue Squad was one of the first persons to arrive on the scene. Chief Vadnais had been with the fire department for 28 years and was an instructor in cardio-pulmonary resuscitation (C.P.R.). He found the insured sitting on a small couch. He could not elicit any response from the insured nor could he detect whether he was breathing. When questioned as to whether he noticed any material coming out of the insured's mouth, he testified:

"I don't know if I noticed at that time or at the time we got him on the floor, but there was kind of a yellow material, a yellow cheese-colored type material in his mouth area."

and later:

"I swept his mouth area, tipped his head to the side, but I didn't get anything, just this yellow type fluid there."

Chief Vadnais moved the insured onto the floor and commenced the C.P.R. procedure. He first attempted to ventilate the insured by blowing air into his lungs. The air exchange was poor, and Chief Vadnais could not see the insured's lungs rise. In response to the poor ventilation, he connected the insured to an "aspirator-resuscitator inhalater," a machine designed to clear out the mouth and throat area with suction and then blow air into the lungs. Even after aspiration, however, air did not appear to go into the insured's lungs. He was then transported to Midway Hospital.

The ambulance was met at Midway Hospital by Dr. John Fee, a long-time personal friend and business associate of the insured. He immediately observed that the insured was deeply cyanotic. There was no heartbeat. Dr. Fee discovered that the insured's mouth and trachea were packed with food material, and suspected that the area below the trachea was packed solid as well. Because of his inability to establish an airway, Dr. Fee discontinued attempts at resuscitation and pronounced the insured clinically dead. The family authorized an autopsy.

At trial, plaintiffs' expert witnesses testified that the insured died of suffocation as a result of massive aspiration of his stomach contents. One of the experts, Dr. Tiffany, testified that this is extraordinary, unforeseen and unexpected, and not the result of disease. Dr. John Coe, defendant's expert, was of the opinion that the insured died of a heart attack. He testified that the food material in the lungs, throat and mouth could have been regurgitated after death as a result of the attempts at cardiopulmonary resuscitation.

The issues presented here are as follows:

(1) Is death caused by the aspiration of gastric contents outside the terms of this accidental death insurance policy as a matter of law?

(2) Did the trial court err in denying defendants requested jury instructions?

(3) Does the evidence support the verdict?

1. At the close of plaintiffs' case, the defendant moved the court for a directed verdict pursuant to Rule 50.01, Rules of Civil Procedure. Its first argument on this appeal is that the trial court improperly denied this motion, contending that, as a matter of law, the aspiration of stomach contents cannot lead to recovery under the terms of an accidental death policy.

Our review of the lower court's disposition of a motion for a directed verdict is guided by the standard as summarized in *J. N. Sullivan & Assoc. v. F. D. Chapman Const. Co.,* 304 Minn. 334, 231 N.W.2d 87 (1975). There we stated:

"It is well settled that a motion for a directed verdict pursuant to Rule 50, Rules of Civil Procedure, presents only a question of law for the trial court regarding the sufficiency of the evidence to present a fact question for the jury to decide. The test to be applied by the lower court *and this court on review* is that the motion should be granted only in those unequivocal cases where (1) in the light of the evidence as a whole, it would

clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case." 304 Minn. 336, 231 N.W.2d 89 (emphasis added; footnotes omitted).

After a thorough consideration of the issue, we agree with the trial court that the aspiration of stomach contents can be a proper basis for recovery under the instant policy.

The policy in question provides coverage:

"If the Employee suffers a bodily injury caused by an accident and as a direct result of such injury and, to the exclusion of all other causes, sustains within not more than 90 days after the date of the accident which causes such injury any of the losses listed in the Table of Benefits in this section, then, provided:

(a) the injury occurs while insurance is in force for the Employee under the group policy; and

(b) the loss resulting from the injury is not excluded from coverage in accordance with the terms of Section 3 hereinafter;" [6]

In other words, subject to possible exclusions, the policy covers deaths resulting from accidental means.[7]

Although we have never dealt specifically with the applicability of such an insuring clause to a death resulting from the aspiration of gastric contents, we have had occasion to define the term "accidental means." We have interpreted "accidental means" as something "unforeseen," "unexpected," or "unusual" which enters into the chain of events to cause the result. *Gidlund v. Benefit Assn. of Railway Employees*, 210 Minn. 176, 177, 297 N.W. 710, 711 (1941); See *Kluge v. Benefit Assn. of Railway Employees*, 276 Minn. 263, 149 N.W.2d 681 (1967). Applying a similar definition of

accidental means, a well reasoned Eighth Circuit Court of Appeals decision found that death caused by aspiration of gastric contents is included within the coverage of an accidental death policy similar to the one involved in this case. *Commercial Insurance Company of Newark, New Jersey v. Orr*, 379 F.2d 865 (8 Cir. 1967).[8] In that case, the court upheld the district court's denial of the insurer's motion for a directed verdict, reasoning as follows:

"* * * Concededly, death was caused by suffocation brought about by the presence of aspirated vomitus in the respiratory tract. Aspiration is the inhalation into the lungs of material other than normal air, thus shutting off oxygen and causing suffocation through mechanical blockage of the trachea or windpipe. The aspiration here resulted from a failure of the epiglottis to perform its usual function of closing over the opening of the air passage during swallowing or regurgitation. Dr. Johnson testified that the epiglottis works by reflex action entirely; that aspiration of vomitus is not a natural thing. It is not usual and it is undesigned. It is '* * * not foreseeable by the victim.' *In other words, the accidental means which resulted in death was the unanticipated failure of the epiglottis to close the air passage and prevent material other than air going into the tubes and the lungs.*" 379 F.2d 871 (emphasis added).

This same reasoning is applicable here. After describing the anatomical structures and processes relative to swallowing and regurgitating, Dr. Tiffany detailed all of the possible causes of aspiration of stomach contents. He then expressed his opinion that the aspiration here was the result of a mechanical failure due solely to the presence of foreign material in the pharynx.

---

6. The only relevant exclusion relates to disease.

7. The distinction between accidental death and death by accidental means has caused confusion in the past. See, e. g., *Kluge v. Benefit Assn. of Railway Employees*, 276 Minn. 263, 149 N.W.2d 681 (1967). This is not at issue here.

8. See also *Jones v. Aetna Life Insurance Company*, 439 S.W.2d 721 (Tex.Civ.App.1969), where the court similarly found that death resulting from aspiration of gastric contents is within the terms of an accidental death policy.

Dr. Tiffany further testified that this was "unforeseen," "unexpected," and "unusual." Thus, applying the definitions of accidental means to the facts of this case and consistent with the rationale articulated in *Orr, supra,* we conclude that, as a matter of law, the aspiration of gastric contents can be a death by accidental means within the terms of the policy in question.[9]

The cases relied on by defendant do not support a contrary result. In the main, defendant relies on *Spott v. Equitable Life Ins. Co.,* 209 Cal.App.2d 229, 25 Cal.Rptr. 782 (1962); *Radcliffe v. National Life & Acc. Ins. Co.,* 298 S.W.2d 213 (Tex.Civ.App. 1957), and *Christensen v. Prudential Ins. Co.,* 235 Or. 93, 384 P.2d 142 (1963). In these cases the policies in question required that the death be caused by "external, violent and accidental means." When such language is present, it is generally accepted that each of those elements must be proven to recover under the terms of the policy. *Christensen v. Prudential Ins. Co., supra,* 235 Or. 97, 384 P.2d 144. In each of these three cases the courts were concerned that the aspiration of vomitus was not an "external" cause of death and thus coverage was denied.[10] *Spott v. Equitable Life Ins. Co., supra,* 209 Cal.App.2d 231, 25 Cal.Rptr. 783; *Christensen v. Prudential Ins. Co., supra,* 235 Or. 98, 384 P.2d 144; *Radcliffe v. National Life and Acc. Ins. Co., supra,* 298 S.W.2d 215. Here, however, the policy requires only accidental means. Thus, to rely on these cases is to ignore the basic rule that rights arising from accidental death policies are contractual and thus controlled by the precise terms of the insurance policy. 10 Couch, Cyclopedia of Insurance Law (2 ed.), § 41.4 at 26.[11]

**2.** Defendant further contends that the trial court ignored a basic exclusion provision of the insurance policy in its instructions to the jury. At issue is Section 3 of the policy, which provides in relevant part:

"No insurance is provided and no benefits shall be payable under the Special Accidental Death and Dismemberment Benefit provision of the group policy, described in Section 1 hereinbefore, with respect to any loss * * * if the loss under Section 1 * * *, or any injury from which such loss results, is caused or contributed to by, or is a consequence of, or is in any way attributable to, any of the following excluded risks, even though the proximate or precipitating cause of said loss * * * is a bodily injury caused by an accident:

(1) bodily or mental infirmity; or

(2) disease of any kind, * * * *"

Based on this policy language, defendant sought, *inter alia,* the following instruction:

"[8.] I instruct you as a matter of law that if you find that George Benz's death on June 22, 1974, was caused or contributed by, or was a consequence of, or was in any way attributable to a heart attack then you must return a verdict for the defendant even though you find the proximate or precipitating cause of his death was a bodily injury caused by an accident. * * * *"

The court denied this request and deliberately deleted some of the language of the policy, finding it "repetitive and almost re-

---

**9.** Moreover, the record clearly contains sufficient evidence to present a jury question as to the cause of death.

**10.** It should be noted that, contrary to these cases, several courts have found the aspiration of gastric contents to be an "external" cause of death. *Peoples Life Ins. Co. v. Menard,* 124 Ind.App. 606, 117 N.E.2d 376 (1954); *Life Insurance Company of Georgia v. Thomas,* 133 Ga.App. 134, 210 S.E.2d 250 (1974).

**11.** Defendant's reliance on *International Travelers Assn. v. Ross,* 292 S.W. 193 (Tex.Com. App.1927), is similarly misplaced. In *Ross,* the

insured died as the result of a brain hemorrhage brought on by the severe straining incident to vomiting. The court concluded that death resulted directly from the nausea because straining is a natural consequence of vomiting. 292 S.W. 194. Here, the facts are entirely different. The jury has determined that Mr. Benz died of aspiration of stomach contents. Both plaintiffs' and defendant's expert witnesses agree that the aspiration of stomach contents is a very unusual occurrence, quite the opposite of a "natural consequence" of vomiting.

dundant." Defendant argues that the instructions "critically omitted" the substance of the policy exclusion, and focuses on three of the court's instructions to support its claim. We find this contention to be without merit.

The jury was asked to answer a single question by way of special verdict:

"Did George W. Benz suffer a bodily injury caused by an accident, which directly caused his death on June 22, 1974 to the exclusion of all other causes, such as bodily infirmity or disease?"

Undeniably this is patterned after the specific language of Section 1 of the insurance policy. After defining the concepts of "bodily injury," "accident," "bodily infirmity," and "disease," the court instructed the jury as follows:

"In the Special Verdict appears the words 'direct cause.' A direct cause is a cause in this case which had a substantial part in bringing about the death of George B. [sic] Benz. There may be more than one direct cause of his death. When the effects of two causes actively work at substantially the same time to cause the death, each may be a direct cause of the death of George B. [sic] Benz.

"In order to answer the question contained in the verdict in the affirmative, bodily injury due to accident must be the sole direct cause of the death of George B. [sic] Benz.

＊　　＊　　＊　　＊　　＊　　＊

"If you find that a bodily injury caused by an accident was a direct cause of the death of George W. Benz and also find that a bodily infirmity or disease or anything other than a bodily injury caused by an accident was also a direct cause of the death of George W. Benz, you would have to answer the question in the negative.

"However, even though you find that George W. Benz was suffering from one or more bodily infirmities or diseases on June 22, 1974, if you find by a greater weight of the evidence that the sole direct cause of his death was an event or series of events which, according to the

definitions I have given you constituted bodily injury due to accident, you would answer the question in the affirmative."

It is well settled that:

"[T]he charge of the trial court must be viewed in its entirety and from a practical and commonsense point of view. The trial court is allowed considerable latitude in the language used, and a new trial will not be granted where requested instructions are refused when the general charge fairly and correctly states the applicable law. All that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law. It is unnecessary that every possible opportunity for misapprehension be guarded against. If the charge fairly lays down the law of the case, it is sufficient."

*Cameron v. Evans*, 241 Minn. 200, 208, 62 N.W.2d 793, 798 (1954). See also *Busch v. Busch Const., Inc.*, Minn., 262 N.W.2d 377, 396 (1977); *Smith v. Kahler Corp., Inc.*, 297 Minn. 272, 282, 211 N.W.2d 146, 153 (1973); *Manion v. Tweedy*, 257 Minn. 59, 64, 100 N.W.2d 124, 128 (1959). Viewing the above instructions as a whole, it is quite clear that the court conveyed the substance of the exclusion clause to the jury. He told them that the sole direct cause of death had to be a bodily injury due to accident. By defining direct cause as any cause having a substantial part in bringing about the death, he incorporated the "cause, contributed to, consequence, and attributable" language of the exclusion. The trial court is to be accorded wide latitude in phrasing its instructions to the jury and the instructions are sufficient so long as they fairly lay down the law of the case. *Busch v. Busch Const., Inc., supra.* Accordingly, we reject defendant's claim.

3. Defendant maintains, as it did below, that the insured's death resulted from a heart attack and that the aspiration of the stomach contents occurred after he was dead and as a result of resuscitation techniques employed, and that therefore the verdict is not supported by the evidence.

In reviewing a jury verdict on appeal, this court must consider the evidence in the light most favorable to the prevailing party. *Kuehl v. National Tea Co.*, 310 Minn. 48, 245 N.W.2d 235 (1976). In so doing, the verdict must be sustained unless it is manifestly and palpably contrary to the evidence. *Hakala v. Megarry Bros.*, 309 Minn. 561, 244 N.W.2d 156 (1976).

Dr. James Ruggles testified by deposition for the plaintiffs. He is board-certified in pathological anatomy and was the doctor who performed the autopsy. Dr. Ruggles' report on the autopsy was admitted into evidence at trial. He expressed his opinion that death was caused by the presence of gastric contents in the tracheal bronchial tree.

Plaintiffs' second expert was Dr. John Fee, who is board-certified in internal medicine, with a subspecialty in cardiology and a background in pathology. He was a personal friend and business associate of the insured, and the doctor who attempted to resuscitate Mr. Benz at Midway Hospital. He reviewed the autopsy report prepared by Dr. Ruggles. Based on that report, it was his opinion that the insured died of asphyxia caused by aspiration of his vomit.

Dr. Francis Tiffany also testified for plaintiffs at trial. He too is board-certified in internal medicine. He was the insured's personal physician. He testified at great length as to both the terminology used in the autopsy report and the insured's prior medical history. In response to a hypothetical question, he testified that the immediate cause of death was the massive aspiration of the stomach contents. He eliminated disease as a possible cause of this aspiration and concluded that it resulted solely from inability of the deceased to clear the vomit from his mouth and throat before he had to take a breath.

Defendant's theory is based upon the testimony of Dr. John I. Coe. He is eminently qualified, being board-certified in both pathological anatomy and forensic pathology. He is the chief pathologist for the Hennepin County Medical Center and the medical examiner for Hennepin County.

Dr. Coe testified that in his opinion the insured died of a heart attack. He based his opinion on (1) the lack of physical disturbance at the scene of death; (2) the deceased's history of high blood pressure, diabetes, and episodes of increased pulse rate; and (3) the autopsy finding of hardening of the arteries to the heart, slight enlargement of the heart, small areas of scar tissue in the heart, and areas of inflammation in the heart muscle. Based on his experience, he testified that it was common for heart attack victims to regurgitate food.

Dr. Coe's testimony was directly refuted by Dr. James Daniel, plaintiffs' rebuttal witness. Dr. Daniel is board-certified in cardiology. He reviewed both the autopsy report and the original slides prepared by Dr. Ruggles at the time of the autopsy. Although he agreed with Dr. Coe that there were certain abnormalities in the deceased's heart, he testified that the heart disease was too mild to be the cause of death. He concluded that the cause of death was aspiration of gastric contents.

In an excellent, detailed memorandum, the trial court, noting that this action was tried over a three-day period by two unusually competent attorneys before an intelligent and attentive jury in an atmosphere totally devoid of any appeal to passion or prejudice, stated:

> "Contrary to defendant's contention, I feel that the great weight of the evidence preponderated in favor of plaintiffs' theory, aspiration before death, rather than a heart attack, death, and then aspiration of vomitus. * * *
>
> \* \* \* \* \* \*
>
> "Trial judges must not substitute their judgment for the fact finder's. New trials should be granted with reluctance and caution. *Koenig v. Ludowese*, 308 Minn. 380, 243 N.W.2d 29; *Joseph v. Haggen* (1977), Minn., 254 N.W.2d 688. Since I am in wholehearted agreement with the jury's verdict, I face no such problem. \* \* \*"

In light of the standards set out in *Kuehl, supra,* and *Hakala, supra,* we must agree

with the trial court and find the defendant's sufficiency argument without merit.

Affirmed.