**Joanne Hester JONES, Appellant,**

v.

**AETNA LIFE INSURANCE COMPANY, Appellee.**

**No. 16994.**

Court of Civil Appeals of Texas.

Fort Worth.

March 21, 1969.

Rehearing Denied April 18, 1969.

Tom Brookman, Fort Worth, for appellant.

Shannon, Gracey, Wright, Ratliff & Miller, and Dan M. Reed, Fort Worth, for appellee.

## OPINION

LANGDON, Justice.

This suit was initiated by the widow (the beneficiary) of William M. Jones, who prior to death was office manager of Mrs. Baird's Bakery, seeking death benefits under a group policy of accident insurance covering the employees of the bakery.

The insured died as a result of asphyxiation due to aspiration of vomitus material.

The parties stipulated that all formal policy requirements were complied with and that in event of verdict and judgment in her favor the plaintiff would be entitled to $8,000.00.

The provisions of the policy germane to this appeal are:

"AETNA LIFE INSURANCE COMPANY, HARTFORD, CONNECTICUT, HEREBY AGREES TO PAY a benefit * * * immediately upon receipt of due proof (a) that any employee of MRS. BAIRD'S BAKERIES, INC. * * * has, while insured hereunder, sustained any of the losses listed in said Table of Benefits; and (b) that such loss resulted directly, and independently of all other causes, from bodily injuries * * * sustained solely through accidental means; * * *.

"EXCLUSIONS Insurance under this policy shall not cover any loss caused directly or indirectly, wholly or partly, or contributed to substantially, by bodily or mental infirmity; or ptomaines; or bacterial infections (except pyogenic infections which shall occur through an accidental cut or wound); or any other kind of disease; or medical or surgical treatment (except such as may result directly from surgical operations made necessary solely by injuries covered by this policy); or war, or any act of war; or suicide, sane or insane."

The defendant plead that the plaintiff was not entitled to any benefits because the loss (death) was not covered under said loss and exclusion provisions.

The case was submitted to a jury on the following special issue and instructions:

"Do you find from a preponderance of the evidence that the death of William M. Jones, on the occasion in question, resulted directly and independently of all other causes, from bodily injury sustained solely through accidental means?

"You are instructed further, in connection with 'accidental means,' as used in Special Issue #1, that by such term is meant something that was unforeseen, unexpected and not designed, proposed or intended by the parties.

"You are instructed that the element of accident must exist in that which produces the death, rather than in mere fact that the death occurs."

The jury answered this special issue in the affirmative. Plaintiff filed a Motion for Judgment on the jury's verdict. Defendant filed a Motion for Judgment Non Obstante Veredicto. The trial judge granted the latter.

The plaintiff on appeal contends that the court erred in overruling her motion and in granting defendant's motion because there was sufficient evidence to raise an issue of fact as to whether or not death was the result of accidental means and to support the jury's affirmative answer thereto.

We reverse and remand.

No evidence was presented by the defendant. The evidence presented by the plaintiff in support of her claim is summarized as follows:

William M. Jones died on Friday, November 19, 1965. He was in good health and 34 years of age just prior to the events leading to his death.

On the date in question Mr. Jones went to work as usual and returned home from work as usual—sometime between 6:30 and 7:00 P.M. He joined his family for an evening meal of hamburgers at 7:30 P.M. It was customary for the family to have hamburgers on Friday night. On the occasion in question the hamburgers were bought from a drugstore about three blocks away from home. All members of the family ate the hamburgers. Mr. Jones ate two of them. "He always had two hamburgers." He also had some potato chips and a coke. No other member of the family developed any problems as result of the meal. There was no testimony to the effect that any food, including the hamburgers, served on the date in question was contaminated or otherwise had anything wrong with it. None of the other members of the family sustained any ill effects from eating the hamburgers.

After eating Mr. and Mrs. Jones watched T.V. for awhile. The children were with them. Mr. Jones did not engage in any physical exertion. He talked to a friend in Dallas about a football game and to someone else about tickets to the New Year's game in Dallas.

After Mr. Jones had talked about the tickets his wife was in the bedroom watching T.V. She heard him "get sick in the bathroom, he vomited. And then he came into the bedroom and told me that he had a pain in his chest, and he looked rather pale". He went into the kitchen and Mrs. Jones went into the bedroom to call the doctor. Thereafter Mr. Jones was heard to open the front door and to fall. Mrs. Jones went to him. He was lying inside the house in the front hall by the front door. It was about 9:30 P.M. when Mr. Jones was on the floor of the hallway. He was very white and not moving. The ambulance came and took him to All Saints Hospital. He was dead on arrival.

Dr. Feliks Gwozdz, Chief Deputy Medical Examiner, held an inquest on the body of William M. Jones on November 9, 1965, and performed the autopsy.

The final pathological diagnosis was:

"1: Asphyxiation due to acute pulmonary edema due to massive aspiration of vomitus material.

"2. The lungs show acute edema and congestion.

"3. There was no evidence of external violence.

"4. There is evidence of massive food intake within the stomach, recent, with vomitus material penetrating the airways, and,

"5. The statement with reference to evidence of moderate atherosclerosis of the coronary vessels, and the heart."

The death certificate shows the immediate cause of death as: (a) Asphyxiation due to (b) massive aspiration of vomitus material.

Additional testimony of Dr. Gwozdz is summarized as follows:

The external body examination failed to reveal any signs of external violence such as scratches, lacerations, bullet penetrations, or stabbings and the pupils were equal. There was evidence of vomitus material accumulated around the nose and oral cavity which was consistent with material later found in the stomach.

Examination of the lungs involved opening widely the trachea (windpipe) from its beginning to where it divides into tubes leading into the lungs. These tubes which should normally be empty contained vomitus material, and several chunks of food, partially in digested state and some not partially digested. Similar material was found in the deep branches of these tubular structures. The lungs showed evidence of acute anoxia, or sudden lack of oxygen. This is represented by a swelling of the lungs and typical signs of particular hemorrhages which are small hemorrhages over the surfaces of the lungs all as a result of the sudden lack of oxygen (acute anoxia).

Examination of the gastro-intestinal tract reflected the stomach was filled to capacity

with an estimated 500 cubic centimeters of partially digested food which was a solid type rather than liquid. The stomach contents were consistent with a very recent meal.

Acute edema is swelling. Asphyxiation means that the air or oxygen supply to the body is cut off.

The term aspiration, according to Dr. Gwozdz, "means lodging of any material into the windpipe and into the parts of the dividing tubes of the lung, which material follows the act of general inspiration, well, the inhaling, the act of inhaling; in other words, foreign particles of material, a fluid, or a solid material that follows the process of inhaling and lodges into the tubular structures is called, in our terminology, aspiration."

Had the subject survived the aspiration it may have produced inflammatory action or a pneumonic state which is the interpretation of aspiration. Aspiration causes a lack of oxygen (acute anoxia) which in turn produces acute edema which produces the hemorrhages over the surface of the lungs.

Dr. Gwozdz's examination revealed nothing in any of the other organs that would have caused this death. *Aspiration of vomitus material by a person of the age and type the subject was found to be would be unusual as would his death from such cause. Such aspiration is a sudden occurrence and in an individual of the type involved an unexpected thing. The doctor classified it as an accidental death—in this case, "it is ruled an accidental asphyxiation." From a medical standpoint, when vomiting occurs in an individual it is not expected that the vomitus material will be aspirated into the lung according to the doctor*. At another point the doctor testified that there was no evidence of trauma to Mr. Jones. He explained this meant that there was no violence which disrupted the external parts of the body meaning the disruption of any tissue or the destruction of skin or bones by a physical agent. In this sense there was no bodily injury to the external parts of the body. *As distinguished from external bodily injury he explained that there was damage done to the body by the aspiration and that this injury was the cause of death. In summary the doctor was of the opinion the aspiration caused the internal bodily injury described as edema and hemorrhaging of the lungs.* (Emphasis ours.)

According to the doctor the vomitus material found in the trachea, lungs et al., was due to the regurgitation of the stomach and that regurgitation would have to occur before aspiration of the vomitus. That in this situation there would be no aspiration absent regurgitation.

On the basis of the testimony contained in the paragraph immediately preceding the appellee argues that, "Without the regurgitation there would have been no aspiration. Since the regurgitation was not caused by accidental means, but must be given a standing as a means, there can be no recovery because the loss was not sustained solely through accidental means independent of all other causes as required by the Aetna policy." International Travelers' Ass'n v. Ross, 292 S.W. 193 (Tex. Com.App., 1927), is cited in support of this position as is Radcliffe · v. National Life & Accident Insurance Co., 298 S.W.2d 213 (Galveston Tex.Civ.App., 1957, writ ref., n. r. e.).

In the Ross case, "The insuring clause of the policy in question, and upon which liability was predicated, provided for indemnity 'against loss resulting from bodily injuries, effected directly, independently and exclusive of all other causes through accidental means (excluding suicide, voluntary or involuntary, sane or insane).' "

It was held in the Ross case that the act of vomiting and straining, the natural and usual effects of nausea, resulted directly in the rupture of the blood vessel and that no other independent cause or agency intervened to produce the injury to the blood vessel. The opinion emphasized that

what happened to Ross was to be distinguished from cases where sickness merely furnishes the condition in which an independent cause operates to produce the injury.

The Supreme Court in International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.2d 282 (1930), discussed the Ross case and others in holding: "* * * The occasion of the death was a dental operation—the pulling of a wisdom tooth and its related treatment. The cause of death was an infection which produced Ludwig's Angina, a result so extraordinary and rare, and so unrelated to the surgical act performed, that it must be regarded as accidental. The drawing of the tooth and treatment following were of course purposeful and not accidental, but the infection was not the necessary or usual result of this purposeful act. It was extraordinary, unusual, and very rare. The proper surgical act therefore must have been accompanied by something unexpected, unforeseen, and improbable. This unforeseen, unexpected, and improbable thing was the injection of the pythogenic organisms into the tissues. * * *"

In the Francis case one of the physicians testified: " 'It is my opinion that he would not have died unless the tooth had been pulled. It is my opinion now that the extraction of that tooth was the direct cause of that trouble. * * *' (This is comparable to the testimony in the instant case to the effect that if there had been no regurgitation there would have been no aspiration.) * * *

"* * * In effect the insurance company here insists that there is a distinction between policies which insure against accidental death and those which insure against death by accidental means. This court has heretofore recognized this difference in the meaning of insurance contracts. Bryant v. Continental Casualty Co., 107 Tex. 582, 589, 182 S.W. 673, L.R.A.1916E, 945, Ann.Cas.1918A, 517; International Travelers' Association v. Ross (Tex.Com.App.) 292 S.W. 193; Robinson v. Aetna Life Ins. Co. (Tex.Com.App.) 276 S.W. 900. We have no disposition other than to follow what we regard as the established rule. That the infection resulting in the death of Mr. Francis was not the natural and probable consequence of the extraction of his tooth, was an effect which does not ordinarily follow and could not have been reasonably anticipated, was not the result of design, and was unexpected, is plainly shown from the uncontradicted evidence. This clearly makes the death an accidental one. Joyce on Insurance (2d Ed.) vol. 5, §§ 2863, 2863a. * * *

"*The authorities declare that accidental means are those which produce effects which are not their natural and probable consequences.* Mr. Cooley in his work on Insurance declares: 'Whether or not the means is accidental is determined by the character of its effects. *Accidental means are those which produce effects which are not their natural and probable consequences. * * * On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of such means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, is produced by accidental means.* It is produced by means which was neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means.' * * * Cooley's Briefs on Insurance (2d Ed.) vol. 6, p. 5234. * * * (Emphasis ours.)

"* * * The expressions we have quoted from Cooley above do not state that because of an injury we infer an accident, but the meaning is that, where normal and ordinary means are employed in the usual way, and, instead of produc-

ing the usual, normal, and expected result, an altogether different and fatal thing happens, the result is an accidental one, because an unknown factor, unexpected and unforeseen, has entered into the circumstances, which the authorities call a vis major or an act of God; * * *."

In Hanna v. Rio Grande Nat. Life Ins. Co., 181 S.W.2d 908 (Dallas Tex.Civ.App., 1944, refused), it was stated:

"Many jurisdictions hold that if the means which cause an injury are voluntarily employed in the usual and intended way, the resulting injury, even though it be entirely unusual, unexpected and unforeseen, is not produced by accidental means; in short, that the means, as well as the result, must be accidental; (cases cited) * * *. Other State authorities, however, apply to the term an interpretation of somewhat broader scope. It is stated in 1 C.J., page 427, viz.: 'Where the effect is not the natural and probable consequence of the means which produce it—an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of the means, or an effect which the actor did not intend to produce, and which he cannot be charged with a design of producing—it is produced by accidental means.' At least since International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.2d 282, 284, our Supreme Court has been committed to the latter or more liberal rule."

Following extensive quotations from the Francis case, supra, the opinion of the court in Hanna continued as follows:

"That plaintiff's cause of action as pled is within these announced principles, is apparent. The unknown factor is alleged, producing a result not beneficial as intended, but fatal. The law of the Francis case has been consistently followed and approved by our Supreme Court. (Citation of authorities and discussion thereof follow.)"

In the Radcliffe case, supra, relied upon by the appellee, the policy provisions providing indemnity for death by accidental means required proof that, "* * * the Insured has sustained bodily injuries effected solely through violent, external, and accidental means, and that such bodily injuries have directly and independently of all other causes, caused the death of the Insured within ninety days from the time such injuries were so sustained, * * *."

The case involved an 18 month old child who had died as a result of aspirating vomitus which caused asphyxiation or suffocation.

At one point in the opinion it was stated that, "In any event, whatever precipitated the regurgitation or vomiting *was neither external nor accidental.*" (Emphasis ours.) The opinion was concluded in following language: "We hold that the facts do not show death resulting from bodily injuries produced solely by a cause or causes at once violent, external, and accidental, because in our view assured's death was produced, in substantial part, at least, by causes which were legally not external and one of which, at least, was not accidental."

In our opinion the Radcliffe case, supra, relied upon by the appellees stands solely for the proposition that the loss (death) involved did not result from violent or *external* means and thus was not covered by the policy of insurance involved in that case.

See also Peoples Life Ins. Co. v. Menard, 124 Ind.App. 606, 117 N.E.2d 376 (1954), which discusses the Ross case, supra; and Commercial Insurance Company of Newark, N. J. v. Orr, 379 F.2d 865 (8th Cir., 1967). In the latter case, "the insured, Edwin C. Orr, died as the result of 'aspiration of vomitus due to acute alcoholic gastritis'." Claim was made under the policy asserting that the cause of death was " 'suffocation due to aspiration of vomitus' " and that " 'his death was

caused by drowning and by asphyxiation'." The insuring clause read:

" 'This policy insures against specified loss described in Part I resulting directly and independently of all other causes from accidental bodily injury occurring during any term of this policy, being hereinafter referred to as "such injury." '

" * * *

"The policy contained no provision that the 'loss' must come from violent or external means.

" * * *

"The appellant states the issue on appeal to be this:

" 'Is a death caused by aspiration of vomitus due to acute alcoholic gastritis and chronic alcoholism within an insurance policy covering injuries "resulting solely and independently of all other causes from accidental bodily injury"?' "

Appellant cites to us a number of cases from other jurisdictions where deaths resulted from aspiration of vomitus. In each instance the policy involved required death to be from "external violent and accidental means". We are not dealing here with an "external means" insuring clause but with an "accidental bodily injury" insuring clause. Some of the cases relied upon by the appellant turn squarely on the use of the word "external", holding that death caused by aspiration of vomitus was not from "external" means, drawing the distinction between food that had been swallowed and then regurgitated as being "internal", whereas food swallowed during the process of eating and gotten into the windpipe accidentally as being "external".

Among the cases cited and discussed was the Radcliffe case, supra.

Following the citation and discussion of many authorities the opinion in Orr was concluded as follows: " '* * * Both the injury and the death were "accidental", as

the term is commonly used and understood.' "

Being unable to improve upon the language utilized in the Francis case, supra, as it applies to the facts of this case we pirate some of its language in holding that, "We have no disposition other than to follow what we regard as the established rule." The aspiration resulting in the death of Mr. Jones was not the natural and probable consequence of the regurgitation.

Aspiration is not the natural and usual effect of vomiting. It was an independent cause or agency which intervened to produce the injury to the lungs of Mr. Jones. Vomiting in itself produced no injury. The aspiration which was unusual, unexpected, and so extraordinary and rare in persons of the age and physical condition of Mr. Jones clearly makes his death an accidental one.

It should be emphasized that in the case at bar Mr. Jones was not involved in any purposeful or intentional act. His involvement was neither purposeful nor voluntary in any sense of the word. The act of vomiting and the aspiration were unexpected, unforeseen and improbable. He undoubtedly was seeking fresh air and survival when he went to the front door of his home and fell.

Numerous questions arising in cases of this type are discussed in 98 A.L.R.2d 318 under the title, "Accident Policy—Choking on Vomit." Reference is made to the authorities and the cases cited in the annotation and the discussions concerning them.

On the basis of the authorities which we have cited and discussed we are of the opinion and hold that the court erred in entering the judgment it did. Such judgment is accordingly reversed and this cause is remanded to the trial court for entry of judgment consistent with our opinion and the stipulations of the parties.

Reversed and remanded.